2019 IL App (1st) 172384-U

No. 1-17-2384

Order filed November 21, 2019

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 489 |
| | ) | |
| MARCUS CLAY, | ) | Honorable |
| | ) | Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Defendant's conviction for attempted aggravated vehicular hijacking is affirmed over his challenge to the sufficiency of the evidence. Defendant's conviction for armed robbery is reduced to robbery where there was insufficient evidence that either he or his co-offender was armed with a dangerous weapon other than a firearm. Defendant's sentence for armed robbery is vacated, and the matter is remanded for resentencing on robbery.

¶ 2     Following a bench trial, defendant Marcus Clay was convicted of attempted aggravated

vehicular hijacking (AVH) with a firearm and armed robbery with a dangerous weapon other

than a firearm. He was sentenced to concurrent terms of eight years' imprisonment on each count. Defendant now appeals, arguing that the State did not prove his guilt beyond a reasonable doubt because the victim's identification of him was unreliable. Alternatively, defendant contends that we should reduce his convictions to attempted vehicular hijacking and robbery, respectively, due to insufficient evidence that either he or his co-offender was armed with a firearm or dangerous weapon other than a firearm. We affirm defendant's attempted AVH conviction, but reduce his armed robbery conviction to the lesser-included offense of robbery and remand for resentencing on that count.

¶ 3    Defendant was charged by indictment with one count of armed robbery with a firearm (720 ILCS 5/18-2(a)(2) (West 2014)) (count I), one count of armed robbery with a dangerous weapon other than a firearm (720 ILCS 5/18-2(a)(1) (West 2014)) (count II), one count of attempted AVH with a firearm (720 ILCS 5/18-4(a)(4) (West Supp. 2015)) (count III), and one count of aggravated unlawful restraint while armed with a firearm (720 ILCS 5/10-3.1 (West 2014)) (count IV).

¶ 4    At trial, Gwendolyn Williams, a professional blues singer, testified that she often stopped at a Marathon gas station located near the intersection of 66th Street and Damen Avenue in Chicago after her nightly performance at a nearby club. On September 28, 2015, Williams arrived at the gas station around 2:30 a.m. and parked her minivan near the entrance to the building. Williams entered the gas station, leaving her purse and cell phone in her van. While Williams was inside the gas station, her van's alarm sounded and the sliding door opened, which sometimes happened due to a malfunctioning key fob. Williams went outside to deactivate her

alarm and close the door, then immediately returned to the gas station and purchased various items.

¶ 5     As Williams exited, she was approached by two African American males who were standing near the front of her van. One of the males, whom Williams later identified as A.W., a juvenile, was approximately 15 years old with a short haircut and a red shirt.[1] The other male, whom Williams identified in court as defendant, was approximately 19 years old with dreadlocks and a white shirt. Both offenders wore their shirts wrapped around their heads instead of on their bodies. However, their faces were visible and Williams saw defendant's face "from the top of his head all the way down." A.W. showed Williams the handle of a black "gun" protruding from his waistband and ordered her to "drop everything." Williams complied, and A.W. retrieved her keys from the ground. He then rummaged through the driver's side of Williams's van while defendant did the same on the passenger's side.

¶ 6     As Williams watched the offenders search her vehicle, she heard the buzzing sound made when the gas station clerk unlocks the door. Another customer entered the gas station, but A.W. drew his "gun," pointed it at Williams from about two feet away, and ordered her not to move. Williams initially remained still with her hands raised, but later "took a chance" and ran into the gas station once A.W. resumed searching her van. Inside the gas station, the other customer was on the phone with the police. After that customer left, A.W. entered the gas station and asked if Williams could come start her van. Williams explained in court that the offenders were unable to start the vehicle themselves because "you have to put the key in a certain way."

---

[1] A.W. is not a party to this appeal.

¶ 7     Williams did not start the van, but hid in the back of the store until the clerk informed her that the police had arrived. Once outside, she noticed that her purse, cell phone, and $300 cash were missing. Approximately 15 minutes later, an officer arrived with defendant in the back of his police vehicle. Defendant pleaded with Williams to "tell him it wasn't me," but Williams told the officer that defendant was one of the robbers. Williams testified that she recognized defendant at that time by his hair, clothing, and face. Williams identified A.W. in a photo array at the police station later that morning.

¶ 8     The State published surveillance footage from cameras inside and outside the gas station, which is included in the record on appeal, but lacks an audio component. At approximately 2:34 a.m. on the video's timestamp, Williams parks her van and walks inside the gas station. Although the rear of the van is visible, the wall of the building blocks the front half of the vehicle. At approximately 2:36 a.m., Williams exits the gas station, deactivates the van's alarm, and shuts the door. She then returns to the gas station to complete her purchase. At around 2:38 a.m., an African American male with a red shirt wrapped around his head appears near Williams's van. He peers in the window of the gas station, and, as Williams exits the store, he runs around the corner of the building near the front of her van. Around 2:39 a.m., Williams stands by the rear of her van with her hands raised while a man dressed in black enters the gas station and immediately places a telephone call. Although neither offender is visible on camera at this time, Williams testified that A.W. was pointing his gun at her from inside the van. Williams runs inside at approximately 2:40 a.m. as the man in black continues to talk on the phone. The offender in the red shirt opens the door to the gas station approximately two minutes

later. He pokes his head through the open doorway, but does not enter. Williams is not visible in the gas station at this time.

¶ 9     On cross-examination, Williams testified that she was "watching everything" during the offense, not just A.W. or his firearm. However, she acknowledged that defendant did not speak to her or display a firearm of his own. Defendant was not wearing a shirt when police returned him to the gas station, but Williams recognized his gray jogging pants. She requested that police remove defendant from the vehicle before identifying him because she could not see him in the backseat.

¶ 10     On redirect examination, Williams testified that defendant was "right there," or approximately 2½ feet away from her when he and A.W. first approached her. She also identified a postarrest photograph of defendant in which he is wearing gray jogging pants and no shirt. Although the photograph shows large tears in the pants, Williams testified that the pants were not torn when she noticed defendant wearing them during the robbery.

¶ 11     Chicago police detective James Sivicek testified that he and his partner, Officer Valeriano,[2] responded to a robbery call at the gas station at approximately 2:41 a.m. Upon arrival, Sivicek noticed two African American men in their "mid to early 20s" near a minivan in the parking lot. One of the men had short hair, while the other, whom Sivicek identified in court as defendant, had dreadlocks. Sivicek explained that, although it was night, the gas station was illuminated by artificial lighting.

¶ 12     The men immediately fled into an alley behind the gas station, and the officers pursued them on foot. Defendant dropped a plastic bag as he ran, which Valeriano recovered. Sivicek

---

[2] The transcript does not contain Valeriano's first name.

continued to chase defendant, but eventually lost sight of him as they ran through a series of gangways east of Damen. Sivicek radioed defendant's last known location to other officers, and Officer Robert Cummings apprehended defendant approximately one block east from where Sivicek lost sight of him. Sivicek traveled to where defendant had been caught and identified him to Cummings.

¶ 13   On cross-examination, Sivicek estimated that he chased defendant for between 45 seconds and 2 minutes before losing sight of him, and that Cummings apprehended defendant between 1 and 2½ minutes thereafter. Defendant was wearing a white tank top when Sivicek lost sight of him, but was not wearing a shirt when Sivicek saw him after the chase. Sivicek did not recover a firearm from defendant.

¶ 14   Valeriano testified that he first observed defendant, whom he identified in court, in the gas station parking lot with another male suspect. The area was "well lit" by artificial lighting, and Valeriano saw defendant's face. Defendant wore a white tank top and had "longer hair" than he did in court. Defendant and the other suspect fled on foot, and Valeriano and Sivicek gave chase. During the chase, defendant dropped a plastic bag containing a cell phone and some snacks. Valeriano recovered the bag and took the cell phone back to the gas station, where Williams identified the phone as hers.

¶ 15   Officer Cummings testified that he and his partner, Officer Barona,[3] were on patrol at around 2:45 a.m. when they received a radio message that fellow officers were pursuing a suspect on foot near the intersection of Damen and Marquette Road. Barona drove to the area, where Cummings saw defendant, whom he identified in court, running eastbound through an

_____

[3] The transcript does not contain Barona's first name.

alley on Damen. Defendant wore dreadlocks, dark jeans, and no shirt. Cummings chased defendant on foot for "a couple blocks" and apprehended him as he attempted to jump over a fence. Cummings never lost sight of defendant during the chase. Afterwards, Cummings took defendant to the gas station, where Williams identified him as one of the robbers. Sivicek and Valeriano also arrived, and one of them identified defendant as the man they chased from the parking lot.

¶ 16    On cross-examination, Officer Cummings testified that he chased defendant for "no more than a minute or two" before apprehending him. Williams was "nervous" and "shooken [*sic*] up," and did not identify defendant until he exited the police vehicle because she could not see him clearly while he was inside. On redirect examination, Cummings stated that he first noticed defendant "[l]ess than a minute" after receiving the radio message about the chase.

¶ 17    Chicago police sergeant Sebastian[4] testified that he received a radio message about the robbery at approximately 2:40 a.m. One of the suspects was described as an African American man wearing cargo pants and a red shirt around his head, and the other was described as an African American man wearing a white tank top and "[m]aybe jeans." Sebastian surveyed the area and eventually spotted A.W. holding a red T-shirt. A.W. dropped the shirt as Sebastian approached, but Sebastian recovered it and detained him.[5]

¶ 18    The State entered a stipulation that Chicago police officer Aguada[6] would testify that he processed defendant at the police station and recovered $181 in various denominations from his person. The State rested.

_____

[4] The transcript does not contain Sebastian's first name.
[5] Sebastian did not state whether he recovered a weapon from A.W.
[6] The transcript does not contain Aguada's first name.

¶ 19    Ivie Clay, defendant's grandmother, testified that she lived in the 6400 block of South Winchester Street, about a 10-minute walk north of the gas station. Defendant came to her home at approximately 1:30 a.m. on the morning of the robbery and left between 2:40 and 2:45 a.m. Ivie knew what time defendant left because she looked at her cell phone and told defendant that it was too late to leave the house.

¶ 20    On cross-examination, Ivie acknowledged that she never told police that defendant had been to her home on the morning of the robbery. Over defense counsel's objection, the State also adduced Ivie's testimony that she and Kensha Clay, defendant's aunt, went to Williams's house to discuss the robbery following defendant's arrest. During this conversation, Kensha showed Williams a photograph on a cell phone. Ivie was present for the conversation, but did not see what was depicted in the photograph. Ivie denied that Kensha offered Williams money in exchange for her refusal to testify against defendant. She also denied speaking to an investigator from the State's Attorney at her home.

¶ 21    Kathy Clay, another of defendant's aunts, testified that she paid defendant $100 every two weeks for babysitting her son. She also gave defendant between $16 and $40 per day as "pocket money" to spend on her son.

¶ 22    On cross-examination, Kathy denied being at Ivie's house in September 2016 when an investigator from the State's Attorney's Office attempted to speak to them. However, Kathy testified that she received a phone call from a man who identified himself as "the person that was trying to put [defendant] behind bars." Kathy refused to give a statement against defendant and hung up the phone.

¶ 23    Defendant testified that he arrived at Ivie's house at approximately 1:15 a.m. on the morning of the robbery and left sometime between 2:30 and 2:45 a.m. He recalled seeing the time on the television when he arrived, and that Ivie told him what time it was as he left because she scolded him for leaving the house so late. When defendant left Ivie's home, he had his cell phone and $200 that Kathy had given him. He walked toward the house of Darious Peoples, his "godbrother," who lived approximately eight blocks away. However, Officer Cummings stopped defendant on the sidewalk and arrested him before he reached Peoples's house. Defendant denied that he was running or trying to hop a fence at the time.

¶ 24    Officer Cummings placed defendant in the back of his police vehicle and drove him to the gas station. At the gas station, defendant exited the vehicle and Williams told the officers something about his pants. He was wearing a white T-shirt and gray jogging pants at the time. He explained that his pants were torn in his postarrest photograph because he "had strings in [his] pants and [the police] ripped them out." Defendant denied participating in the robbery.

¶ 25    On cross-examination, defendant acknowledged that he spoke to a female detective at the police station after his arrest. However, he did not recall being asked where he had been that night. He denied telling her that he lived in the 6400 block of South Winchester, that he had been watching football there earlier that night, or that he went to Peoples's house at around 1 a.m. Defendant also denied telling the detective that Kathy had given him $50 of the money found in his pocket, but acknowledged stating that Kathy had given him between $20 and $30. Defendant initially denied telling the detective that he had left his grandmother's house just prior to his arrest, but later testified that he told her that he had "just left out of the house."

¶ 26 On redirect examination, defendant testified that he was arrested approximately 2½ blocks from Ivie's house. He explained that he removed his shirt for his postarrest photographs because the police wanted to photograph his tattoos.

¶ 27 The State recalled Williams, who testified that two women who identified themselves as defendant's aunt and grandmother came to her house several hours after the robbery. Defendant's aunt showed Williams a Facebook photograph of defendant, A.W., and "some other guys." Williams identified defendant and A.W., and the woman "stormed out" of Williams's yard. Defendant's grandmother asked Williams "how much would it take for this to go away," which Williams understood as an offer to pay her for exculpating defendant. Williams declined the offer, and the conversation ended.

¶ 28 On cross-examination, Williams acknowledged that the women did not show her any money or specify a dollar amount. Williams reported the conversation to Chicago police detective Roxana Hopps after the women left.

¶ 29 Detective Hopps testified that she advised defendant of the *Miranda* rights and interviewed him at the police station following his arrest. Defendant told her that he watched football at his home in the 6400 block of South Winchester on the night before the robbery. He then walked to Peoples's house, where he stayed from 1 a.m. to 2 a.m. Defendant did not mention going any other places.

¶ 30 Defendant also initially told Detective Hopps that Kathy had given him all of the money police found in his pocket. However, after Detective Hopps asked for Kathy's contact information in order to verify his claim, defendant stated that only $50 of that money had come from Kathy.

¶ 31    On cross-examination, Detective Hopps testified that Williams called several hours after the robbery to report that members of defendant's family had approached her and made her feel "uncomfortable." Detective Hopps testified that she "[v]aguely" remembered the conversation, but did not recall Williams saying that she had been offered money.

¶ 32    Ron Ryan, an investigator for the Cook County State's Attorney's Office, testified that he went to Ivie's home in the 6400 block of South Winchester on September 1, 2016. A woman answered the door and identified herself as Kathy Clay. Ryan identified himself and his office and asked to interview her. Kathy told him that she "had nothing to say." Ivie also came to the door, and Ryan identified himself to her. However, Ivie also declined to speak with him. Ryan denied having any further contact with either woman.

¶ 33    After arguments, the trial court stated that Williams was a "very credible witness" and that "virtually everything that she testified to that could be seen via the video camera was corroborated." The court also noted that defendant "had a very identifiable look," and that Sivicek and Valeriano also identified him as one of the offenders. In contrast, the court opined that defendant's alibi was "simply not credible." Additionally, the court noted that A.W. "was the one who had the weapon," and that "the gun itself was never recovered." The court ultimately found defendant guilty on count II (armed robbery with a dangerous weapon other than a firearm) and count III (attempted AVH with a firearm), but not guilty on count I (armed robbery with a firearm) and count IV (aggravated unlawful restraint with a firearm).

¶ 34    Defendant filed a motion for a new trial, arguing, *inter alia*, that Williams's identification was not reliable. The court denied the motion, and, following a hearing, sentenced defendant to concurrent terms of eight years' imprisonment on each count.

¶ 35    On appeal, defendant first argues that the evidence was insufficient to sustain his convictions because "[t]he totality of the circumstances reflect that [he] was not the suspect who Williams encountered at the gas station." In particular, defendant again contends that Williams's identification was unreliable.

¶ 36    Upon a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and deciding which inferences to draw from the facts. *People v. Harris*, 2018 IL 121932, ¶ 26. Thus, a reviewing court must not retry the defendant or substitute its own judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Gray*, 2017 IL 120958, ¶ 35. Instead, a conviction will be reversed only where the evidence was "so improbable or unsatisfactory that a reasonable doubt remains as to defendant's guilt." *Harris*, 2018 IL 121932, ¶ 26.

¶ 37    The positive testimony of a single credible eyewitness is generally sufficient to sustain a conviction, even when it is contradicted by the defendant. *Gray*, 2017 IL 120958, ¶ 36. When a conviction depends on an eyewitness's identification, a reviewing court must determine whether any rational trier of fact could accept the witness's testimony beyond a reasonable doubt. *Id.* In assessing the reliability of an eyewitness identification, Illinois courts utilize the five-factor test set forth in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). *People v. Slim*, 127 Ill. 2d 302, 307 (1989). The *Biggers* factors are: "(1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness'[s] degree of attention; (3) the accuracy of the witness'[s] prior

description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *Slim*, 127 Ill. 2d at 307-308.

¶ 38 Applying these factors to the present case, it is clear that a rational trier of fact could have credited Williams's identification. First, the evidence established that Williams had ample opportunity to view defendant during the offense, as defendant was approximately 2½ feet away when he and A.W. first approached her. Williams testified that defendant's entire face and hair were visible, which was corroborated by Officers Sivicek and Valeriano. Additionally, although the offense occurred at night, the evidence showed that the area surrounding Williams's van was "well lit" with artificial lighting.

¶ 39 The record also reveals that Williams had a high degree of attention toward defendant, as she specifically denied defense counsel's suggestion that she focused solely on A.W. and his weapon. Instead, Williams testified that she was "watching everything," which is consistent with the fact that the video generally corroborates her version of events.

¶ 40 With respect to the third *Biggers* factor, the accuracy of the witness's prior descriptions, we note that Williams did not describe defendant to the police before identifying him in the show-up. Instead, defendant was arrested in part because he matched the description Officer Sivicek relayed to Officer Cummings, which was consistent with how Williams described defendant's appearance during her testimony. Williams's description is also corroborated by defendant's postarrest photograph, with the exception that he is shirtless in the photograph. Although defendant suggests that the photograph undermines Williams's testimony that he wore a white shirt around his head during the robbery, we note that defendant's own testimony was

that he was wearing a white shirt when he was arrested. Additionally, both Sivicek and Valeriano testified that defendant was wearing a white shirt when they chased him from the gas station.

¶ 41    We also reject defendant's argument that Williams was uncertain in her identification because she did not identify him in the show-up until after he exited the police vehicle. Instead, the evidence established that Williams simply could not see into the vehicle, and immediately identified defendant as one of the offenders once she got a clear view of him. Moreover, Williams unequivocally identified defendant in court.

¶ 42    The fifth *Biggers* factor, the length of time between the offense and the identification, also weighs in the State's favor. Williams testified that she identified defendant within 15 minutes of the robbery. This timeline was corroborated by the officers, whose testimony collectively established that they arrived while defendant was still at the gas station, apprehended him after a brief chase, and immediately returned him to the gas station for the show-up. Under these circumstances, Williams's identification was reliable and sufficient to establish that defendant was one of the offenders.

¶ 43    We also note that, Williams's identification aside, Sivicek and Valeriano both testified that they responded to the gas station and saw defendant and another man with a red shirt by Williams's van. Both officers observed defendant's face, dreadlocks, and white shirt. Both officers also chased defendant when he fled, and observed him drop a plastic bag that was later determined to contain proceeds from the robbery. Although defendant eluded the officers, Officer Sivicek radioed defendant's description and last known location to Officer Cummings, who found defendant nearby within a minute. Cummings apprehended defendant shortly thereafter without losing sight of him. Thus, the evidence that defendant was one of the offenders

was overwhelming, and his challenge to the sufficiency of the identification testimony is not persuasive.

¶ 44    Defendant next argues that his convictions for attempted AVH and armed robbery should be reduced to attempted vehicular hijacking and robbery, respectively. In particular, defendant maintains that there was insufficient evidence to sustain either of his convictions because no evidence established that he or A.W. was armed with a firearm or other dangerous weapon. The State contends that we should instead leave defendant's attempted AVH conviction undisturbed and reduce his armed robbery conviction to aggravated robbery.

¶ 45    We first address defendant's argument regarding his conviction for attempted AVH. A person commits the offense of attempted vehicular hijacking when he takes a "substantial step" towards taking a motor vehicle from the presence of another by threatening the immediate use of force. 720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/18-3(a) (West 2014). The offense becomes aggravated, if, as relevant here, the offender commits the crime while armed with a firearm. 720 ILCS 5/18-4(a)(4) (West Supp. 2015).

¶ 46    The crux of defendant's argument is his assertion that the trial court had a reasonable doubt as to whether A.W.'s weapon was a firearm. In support, defendant relies on the court's statement that "the gun itself was never recovered." Thus, defendant contends that an essential element of his attempted AVH conviction—*i.e.*, the possession of a firearm by him or A.W.—was not proven beyond a reasonable doubt.

¶ 47    The flaw in defendant's argument is that it falsely equates the court's observation that a firearm was not recovered, which was an uncontested fact at trial, with an express finding that a firearm was not used during the offense. However, it is well-established that the State may

establish that a defendant was armed during an offense without evidence that the firearm was recovered. See, *e.g.*, *People v. Washington*, 2012 IL 107993, ¶ 36; *People v. Charles*, 2018 IL App (1st) 153625, ¶ 29. Rather, our supreme court has found that the State may prove that a defendant was armed with a firearm through a witness's " 'unequivocal testimony and the circumstances under which he was able to view the gun.' " *People v. Wright*, 2017 IL 119561, ¶ 73 (quoting *Washington*, 2012 IL 107993, ¶ 36).

¶ 48    Here, Williams unequivocally and repeatedly described A.W.'s weapon as a black "gun." The record also shows that Williams had a sufficient opportunity to view the weapon, as A.W. pointed the barrel at her from mere feet away. Thus, there was sufficient evidence to support the trial court's finding of guilt on count III (attempted AVH with a firearm).

¶ 49    To the extent defendant argues that his attempted AVH conviction cannot stand because it is legally inconsistent with his acquittal for armed robbery with a firearm, we note that "defendants in Illinois can no longer challenge convictions on the sole basis that they are legally inconsistent with acquittals on other charges." *People v. Jones*, 207 Ill. 2d 122, 133-34 (2002). This is especially so in a bench trial, where the court is presumed to know the law and the likelihood that its findings are a result of confusion is remote. *People v. McCoy*, 207 Ill. 2d 352, 357 (2003).

¶ 50    We also note that, although defendant claims that no "reasonable explanation can be postured" for the trial court's apparently inconsistent findings, the record suggests that the court was merely exercising leniency. See *id.* at 358 (acknowledging, without condoning, the reality that trial judges sometimes render inconsistent verdicts in the name of leniency). In particular, the court was presumably aware that the possession of a firearm during an armed robbery carries

a mandatory 15-year sentencing enhancement. See 720 ILCS 5/18-2(b) (West 2014). Thus, the minimum sentence available on count I would have been 21 years, significantly more than the 8-year sentence the court imposed on count II. In any event, the particular reason for a trial court's inconsistent findings need not be apparent (*McCoy*, 207 Ill. 2d at 358), and we may affirm on any basis in the record (*People v. Sardin*, 2019 IL App (1st) 170544, ¶ 110).

¶ 51    Finally, defendant argues that his conviction for armed robbery with a dangerous weapon other than a firearm should be reduced to simple robbery because no evidence was presented to suggest that A.W.'s weapon was anything other than a firearm. The State agrees that the evidence did not support the armed robbery conviction, but contends that we should instead reduce the conviction to aggravated robbery.

¶ 52    In order to convict defendant of armed robbery as charged in count II, the State was required to prove that either he or A.W. possessed a dangerous weapon other than a firearm. 720 ILCS 5/18-2(a)(1) (West 2014). Notably, a firearm does not qualify as a dangerous weapon other than a firearm, regardless of how it is used in a particular offense. *People v. McBride*, 2012 IL App (1st) 100375, ¶ 24; see also *People v. Spencer*, 2014 IL App (1st) 130020, ¶ 40 (under the armed robbery statute, "[a] firearm cannot simultaneously be a firearm and something other than a firearm").

¶ 53    Here, the only evidence of the nature of A.W.'s weapon was Williams's unequivocal testimony that it was a firearm. We therefore agree with the parties that there was insufficient evidence supporting defendant's conviction for armed robbery with a dangerous weapon other than a firearm. Consequently, we consider the appropriate offense to which defendant's conviction should be reduced.

¶ 54   Because every criminal defendant has a fundamental due process right to be notified of the charges against him, a defendant generally may not be convicted of an offense for which he has not been charged. *People v. Kennebrew*, 2013 IL 113998, ¶ 27. However, when a reviewing court finds insufficient evidence to support a charged offense, it may enter a finding of guilt on an uncharged offense instead if (1) the uncharged offense is a lesser-included offense of the charged offense, and (2) the evidence rationally supports a conviction on the uncharged offense. *People v. Kolton*, 219 Ill. 2d 353, 359-60 (2006). An uncharged offense is a lesser-included offense if the charging instrument contains a " 'broad foundation' " or " 'main outline' " of the elements of the uncharged offense. *Kennebrew*, 2013 IL 113998, ¶ 30. The uncharged offense need not be inherent in the charged offense, and the charging instrument need not specifically allege every element of the uncharged offense. *Kolton*, 219 Ill. 2d at 367. Rather, it is sufficient that any missing elements "can reasonably be inferred" from the charges. *Id.* Whether an offense is a lesser-included offense of a charged crime is reviewed *de novo*. *Kennebrew*, 2013 IL 113998, ¶ 18.

¶ 55   Relevant here, a person commits the offense of aggravated robbery when he takes property from another "while indicating verbally or by his *** actions to the victim that he *** is presently armed with a firearm or other dangerous weapon." 720 ILCS 5/18-1(b)(1) (West 2014). A person may be guilty of aggravated robbery even if it is later determined that he did not actually possess a firearm or other dangerous weapon. *People v. Gray*, 346 Ill. App. 3d 989, 994 (2004). Here, count II of the indictment alleged that defendant took Williams's property while armed with a dangerous weapon other than a firearm. Thus, the only element of aggravated

robbery absent from count II was an allegation that defendant indicated he was armed with (1) a firearm, or (2) a dangerous weapon other than a firearm.

¶ 56    The State observes that this court found aggravated robbery to be a lesser-included offense of armed robbery in *People v. Johnson*, 2015 IL App (1st) 141216. However, the defendant in *Johnson* was convicted of armed robbery with a firearm based on an indictment that alleged he took money from the victim while armed with a firearm. *Id.* ¶ 5. Thus, we concluded that it was reasonably inferable from the indictment that the defendant indicated to the victim that he was armed with a firearm. *Id.* ¶ 36.

¶ 57    This case differs from *Johnson* in that defendant here was convicted of armed robbery based on a count of the indictment that specifically and exclusively alleged that he was armed with a dangerous weapon other than a firearm. Generally, a charging instrument that alleges only the use of a firearm during an offense does not put the defendant on notice that the State may also seek to convict him based on the use of a dangerous weapon other than a firearm. See *People v. Clark*, 2016 IL 118845, ¶ 38 (armed robbery with a dangerous weapon other than a firearm not a lesser-included offense of armed robbery with a firearm); see also *People v. Booker*, 2015 IL App (1st) 131872, ¶ 59 (same, but with armed home invasion). It stands to reason that the converse is also true, *i.e.*, an indictment alleging that the defendant possessed a dangerous weapon other than a firearm does not reasonably imply an allegation that the defendant possessed a firearm. Thus, as charged here, aggravated robbery with a firearm was not a lesser-included offense of armed robbery with a dangerous weapon other than a firearm.

¶ 58    Further, even if we were to find that aggravated robbery with a dangerous weapon other than a firearm was a lesser-included offense under the circumstances of this case, the evidence

would not support a finding that defendant or A.W. indicated that they were armed with anything other than a firearm. We therefore cannot reduce defendant's conviction to aggravated robbery with a dangerous weapon other than a firearm either. See *Kennebrew*, 2013 IL 113998, ¶ 30 (reviewing court may not enter judgment on a lesser-included offense unless the evidence rationally supports it).

¶ 59    However, we agree with defendant that his conviction should be reduced to robbery. A person commits robbery when he knowingly takes property from the victim's presence through the use of force. 720 ILCS 5/18-1(a) (West Supp. 2015). Count II of the indictment clearly alleged each element of this offense. Moreover, we accept defendant's concession that the evidence supports a robbery charge, as Williams's testimony established that defendant and A.W. approached her in a gas station parking lot, pointed a weapon at her, and took control of her property.

¶ 60    Although we reduce defendant's conviction to robbery, we decline to enter a new sentence thereon. Instead, we must remand to the trial court for resentencing. The sentencing range for armed robbery with a dangerous weapon other than a firearm is 6 to 30 years' imprisonment with 3 years' mandatory supervised release (730 ILCS 5/5-4.5-25(a) (West 2014); 730 ILCS 5/5-8-1(d)(1) (West 2014)), while the sentencing range for robbery is 3 to 7 years' imprisonment with 2 years' mandatory supervised release (730 ILCS 5/5-4.5-35(a) (West 2014); 730 ILCS 5/5-8-1(d)(2) (West 2014)).

¶ 61    The Illinois Department of Corrections website, which is subject to judicial notice (*People v. Peacock*, 2019 IL App (1st) 170308, ¶ 4 n.1), shows that defendant has been released from prison and was scheduled to complete his three-year term of mandatory supervised release

on February 19, 2022. Thus, even subject to the two-year period of mandatory supervised release for robbery and attempted AVH, defendant would not complete his sentence until February 2021. Because defendant is still subject to mandatory supervised release, we remand to the trial court for resentencing on robbery.

¶ 62    In sum, we affirm defendant's conviction for attempted AVH, but reduce his conviction for armed robbery to the lesser-included offense of robbery. We also vacate his sentence for armed robbery and remand the matter for resentencing on robbery.

¶ 63    Affirmed in part; modified in part; remanded in part.