2021 IL App (1st) 190505-U

No. 1-19-0505

Order filed May 18, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 28447 |
| | ) | |
| MOHAMED NAKHLEH, | ) | Honorable David Sterba, |
| | ) | Colleen Ann Hyland |
| Defendant-Appellant. | ) | Judges presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Cobbs and Lavin concurred in the judgment.

**ORDER**

*Held*:   We affirm defendant's conviction for attempted first degree murder where the evidence was sufficient for the trial court to find that the State proved his guilt beyond a reasonable doubt. We also affirm defendant's 24-year sentence, which was not excessive or an abuse of discretion.

¶ 1     Following a 2005 jury trial, defendant Mohamed Nakhleh was found guilty of attempted first degree murder (720 ILCS 5/8-4(a) (West 2002); 720 ILCS 5/9-1 (West 2002)) and aggravated battery with a firearm (720 ILCS 5/12-4.2 (West 2002)). After merging the aggravated battery into the attempted murder count, the court sentenced defendant to 24 years' imprisonment. On appeal,

he contends that the State's evidence was insufficient to prove his guilt beyond a reasonable doubt and, in the alternative, that his sentence was excessive. For the following reasons, we affirm.

¶ 2    In connection with a 2003 shooting, defendant was charged in a 33-count indictment, with, as relevant here, one count of attempted first degree murder arising from the shooting of Samer Abdallah (count I); a second count of attempted murder for shooting at Mohammad Qader (count II); and aggravated battery for shooting Abdallah (count III). Before trial, the remaining counts were nol-prossed.

¶ 3    Defendant failed to appear for his 2005 jury trial, and he was tried *in absentia.*

¶ 4    At trial, Abdallah testified that around 12:30 a.m. on November 9, 2003, he was driving Qader home in Abdallah's Lexus. Near the intersection of 95th Street and Roberts Road, a red Ford pulled up next to the Lexus. The person in the Ford's front passenger seat, whom Abdallah identified as defendant, was "throwing up hand gestures." Defendant also appeared to be yelling although Abdallah could not hear what he was saying. Qader, who was in the front passenger seat of the Lexus, rolled down his window and said something to the occupants of the Ford. Abdallah "drove up to get away from them" and switched lanes. The Ford then approached the left side of the Lexus.

¶ 5    Abdallah recalled that Qader said something and "pulled me down enough to get my attention." Abdallah looked to his left and saw that defendant was hanging out the window of the Ford and pointing a gun at him. Abdallah ducked and put up his left arm. He heard a shot and saw a bullet hole in his window. He then noticed blood and "two holes" in his left arm. Abdallah drove to a police station, while Qader called police. Abdallah was transported by ambulance to a hospital. During his testimony, Abdallah showed the jury entrance and exit wounds in his left arm.

¶ 6 On November 10, 2003, Abdallah viewed two lineups at the police station. The first lineup contained women. He identified a woman in that lineup as the Ford's driver. In a second lineup, he identified defendant as the shooter. During his testimony, Abdallah identified photos of his Lexus, including the damaged driver's side window, as well as photos of the Ford.

¶ 7 On cross-examination, Abdallah acknowledged that he was talking on his cell phone while he was driving. He agreed that the initial interaction where he saw defendant making hand gestures lasted a matter of seconds. He agreed that he ducked as soon as he saw someone with a gun, and that his opportunity to view the shooter lasted "mere seconds."

¶ 8 Qader similarly testified that Abdallah was driving him home when he noticed a red Ford pull up next to them with "a few girls in the back seat." Qader saw a woman driving the Ford. He then saw a man lean out of the passenger window, waving his hands and shouting. Qader identified People's Exhibit No. 1 as a photograph of defendant, the person who was in the Ford's front passenger seat. Qader believed defendant was making "gang signs." Qader rolled down his window and "told [defendant] that we weren't gang members."

¶ 9 Abdallah then drove the Lexus into a right turn lane. The Ford pulled up in the center lane, to the left of the Lexus. Qader saw defendant with his "hands almost to his elbows out of the window" holding a gun with both hands. The gun was pointed at Abdallah, who was talking on the phone. Qader "slid down into the seat," told Abdallah to duck, and "grabbed [Abdallah's] shirt or shoulder and threw him down." Qader heard a shot and saw blood on Abdallah's clothing. Qader then called 911.

¶ 10 Later that night, Qader spoke to Detective Mark Zvokel and described the Ford. Qader told Zvokel that the Ford was driven by a white woman and that the shooter was a white male with a

"little dark complexion." A short time later, Zvokel drove Qader to a location on LaGrange Road. As they pulled up, Qader saw five females leaning on a guardrail and a male talking to a police officer. Qader identified one of the women as the driver of the Ford and identified defendant. Qader also identified People's Exhibit 11 as the gun that was used in the shooting.

¶ 11    On cross-examination, Qader acknowledged that his seat was partially reclined when he first noticed the Ford. He ducked when he saw a gun and did not see the shooter pull the trigger. Qader agreed that when police brought him to LaGrange Road, he identified the "only male at the scene" as the gunman.

¶ 12    Candace Johnson testified that on evening of November 8, 2003, she went to her friend Cathy Weber's house with two other friends.  Later that evening, Johnson called a man named Louie, who was defendant's brother. Johnson and Louie made plans for Johnson and her friends to go to Louie's house. Louie sent defendant and another friend, Amanda Hagadus, to pick up Johnson and her friends. Defendant and Hagadus picked up Johnson and her friends in Hagadus' vehicle, a red car, and the group returned to Louie's house. Later that evening, defendant showed Johnson a gun, which Johnson identified as People's Exhibit 11.

¶ 13    Around 12:30 a.m., Hagadus began to drive Johnson and her friends back from Louie's house. Defendant was in the front passenger seat. Near the intersection of 95th Street and Roberts Road, a Lexus with two men approached Hagadus' car from behind. Defendant "didn't take liking to that car" and began making hand gestures. Defendant told Hagadus to roll down her window, and she did. The Lexus rolled down its window, and the men in the Lexus said something.

¶ 14    A short time later, the Lexus "came up behind [the Ford] rather fast" before passing. Defendant told Hagadus to drive up next to the Lexus. Defendant took out his gun, "told us in the

- 4 -

back seat to get down" and leaned out the window with the gun. He fired a shot, and Johnson saw a hole in the Lexus' driver's side window. Defendant then told Hagadus to pull into a parking lot. When she did, defendant found the shell from the shot and gave it to Hagadus, who "cleaned it off and gave it back to him and he threw it."

¶ 15    Hagadus resumed driving. On LaGrange Road, a police car approached the Ford from behind and turned its lights on. Defendant told Hagadus "to not stop yet." Defendant wiped the gun with his shirt and threw the gun out of the window. After Hagadus stopped the car, the police ordered everyone out. Johnson later told police where defendant had disposed of the gun.

¶ 16    Officer Michael Pawlowski of the Village of Hodgkins Police Department testified that he was on patrol when he received a radio message of a shooting involving a red Ford Tempo, with three to five women and a male occupant. Shortly thereafter, he saw a vehicle matching that description and activated his emergency lights. The Ford did not immediately pull over but eventually stopped.

¶ 17    Pawlowski ordered the occupants to exit the vehicle. The driver of the vehicle was a woman, whom he identified as the person in People's Exhibit 12. The passenger was a man, whom he identified as the person in People's Exhibit 1.

¶ 18    Pawlowski inspected the Ford and saw a live round of ammunition on the floor. After speaking with one of the occupants, he searched the area and found a firearm on the side of the road, between 50 and 100 yards from the Ford. He identified the firearm as People's Exhibit 11. Pawlowski did not see anyone toss anything from the Ford before it stopped.

¶ 19    Investigator Michael Raab of the Cook County Sheriff's Police testified that he collected a gunshot residue kit from defendant. He also recovered a deformed copper jacket lead projectile from the dashboard of the Lexus.

¶ 20    Detective Mark Zvokel testified that shortly before 1 a.m. on November 9, 2003, he responded to a radio dispatch and spoke to Abdallah and Qader. A short time later, Zvokel took Qader to a location about two miles away to view individuals that had been stopped by another police officer. Qader identified defendant as the person who shot Abdallah and identified Hagadus as the driver of the Ford Tempo.

¶ 21    On November 10, 2003, Zvokel conducted two physical lineups, which were viewed by Abdallah. The first lineup included Hagadus and five other women. Zvokel testified that Abdallah identified one of the individuals in that lineup, although Zvokel did not specify which person Abdallah identified. The second lineup included defendant with five other men who shared similar physical characteristics. Zvokel testified that Abdallah identified defendant in the second lineup.

¶ 22    The parties stipulated that an emergency room doctor would testify that Abdallah was treated for a gunshot that entered and exited his left arm. The parties also stipulated that Lieutenant Michael Tardy of the Hickory Hills Police Department would testify that Officer Pawlowski lead him to a gun approximately 40 yards from a red Ford. Tardy recovered a semiautomatic handgun with an unfired cartridge in the chamber and an unfired cartridge in the magazine. The parties further stipulated that a forensic scientist with the Illinois State Police examined the firearm and cartridges but did not find latent fingerprint impressions suitable for comparison. Another forensic scientist determined that the recovered fired bullet was fired from the same handgun.

¶ 23    Scott Rochowicz, an expert in gunshot residue analysis, testified that he analyzed the gunshot residue kit collected from defendant. He concluded that defendant discharged a firearm, contacted an item with gunshot residue, or was in close proximity to a firearm when it was discharged.

¶ 24    Assistant State's Attorney Michael Deno testified that he was present in court on November 5, 2004, when defendant was advised that he could be tried *in absentia* if he failed to appear in court. However, defendant failed to appear at three subsequent court dates.

¶ 25    The jury found defendant guilty of attempted first degree murder of Abdallah (count I) and aggravated battery with a firearm to Abdallah (count III). Defendant was found not guilty of attempted first degree murder of Qader (count II).

¶ 26    Defense counsel filed a motion for a new trial, which was denied.

¶ 27    Defendant's presentence investigative (PSI) report reflected that he was born in December 1979. His criminal history included: a 1999 conviction for possession of a firearm; a May 2000 conviction for criminal damage to property; a 2001 conviction for "aggravated discharge firearm occupied building" for which he was sentenced to five years' imprisonment; a 2001 conviction for "possession of a weapon in penal institute"; a 2001 conviction for "Aggravated unlawful use weapon/vehicle" for which he was sentenced to two years' imprisonment; and a 2003 conviction for criminal trespass to land.

¶ 28    The trial court merged the aggravated battery with a firearm offense (count III) into the attempted first degree murder conviction (count I) and proceeded to sentencing on that count. Defendant did not appear at the September 1, 2005 sentencing hearing. The State noted that defendant was eligible for six to 30 years' imprisonment and argued that aggravating factors

warranted much more than the six-year minimum term. The State urged that defendant's criminal background showed "escalating violence" and asked the court to "send[] a message" that a person "cannot thumb [his] nose at the system and not show up to court and think it's all going to go away." In mitigation, defense counsel argued that defendant was a young man who was capable of rehabilitation if given a chance to become a productive member of society. Defense counsel did not seek a minimum six-year term but suggested that a sentence "in the eight to ten years range" would be appropriate.

¶ 29    In imposing sentence, the court remarked:

> "The Court has considered all of the statutory factors in aggravation and mitigation as well as the nature and circumstances of the offense. * * *
>
> The Court finds that the Defendant is a dangerous man from which society needs to be protected. His history is one of guns and violence and he represents a grave threat to the community and he has earned a substantial prison sentence in this case and in this Court's judgment, a sentence of 24 years Illinois Department of Corrections is a just sentence and I will so impose it."

The court further determined that, upon apprehension, defendant would receive 340 days credit for time already served.

¶ 30    The sentence was entered on September 1, 2005. Defendant's counsel filed a notice of appeal from his conviction and sentence on September 19, 2005 (the 2005 NOA). Notably, the 2005 NOA was never transmitted from the circuit court to our appellate court.

¶ 31 An arrest warrant for defendant was issued on September 21, 2005. The record reflects that defendant was arrested in Israel in May 2014, where he was detained for several years before he was extradited and returned to Illinois.

¶ 32 In September 2018, the circuit court conducted further proceedings in this case.[1] At a hearing on September 13, 2018, defendant's private counsel appeared before the court. At that time, the trial court summarized the history of the case, noting the July 2005 trial and guilty verdict and further stating:

> "Judge Sterba, on September 1st, 2005, held a sentencing hearing in the defendant's absence and imposed sentence of 24 years * * *. An outstanding warrant was in place for the Defendant's arrest since 2005 in the amount of no bail. That warrant has obviously been executed, and bond will stand on the warrant in the amount of no bail. I know that the sentencing hearing occurred some time ago, so I would like to get a copy of the transcript of that hearing."

The court also noted that defendant had another open case for violation of a bail bond (case 05 CR 15467).[2]

¶ 33 Defense counsel requested a continuance and told the trial court: "I do anticipate some motions relative to the time that [defendant] served in an Isreali [sic] prison awaiting extradition back to Illinois, as well as discussing with the State what their position on the VOBB, the '05 case, would be." The court continued the matter, stating that it would review the 2005 sentencing hearing, and would "set it down for any motions and also to address the imposition of the

---

[1] Although Judge David Sterba presided over the 2005 trial and sentencing, the 2018-19 court proceedings described herein were presided over by Judge Colleen Ann Hyland.

[2] The State ultimately nol-prossed the violation of bail bond in that case.

sentence." On October 30, 2018, defense counsel and the State jointly requested a continuance to November 19, 2018, with the State indicating its expectation that "both matters will be taken care of that day."

¶ 34    At the November 19, 2018 hearing, defense counsel informed the trial court that defendant and the State had reached an agreement to credit defendant for additional time served, reflecting the period "he was overseas being held by the Israeli authorities." The parties agreed to adjust defendant's sentencing credit to a total of 1933 days, consisting of the 340 days served in Cook County (previously reflected in the 2005 sentencing order), as well as another 1593 days' credit for time that defendant was detained overseas.

¶ 35    After the trial court confirmed that both parties agreed to the same calculation, the court addressed defendant as follows:

> "I have received a copy of the sentencing hearing that was held in your absence
> pursuant to the trial *in absentia* statute. * * *. And upon completion of that
> hearing, the Court did impose a sentence.
>
> So today I am here—Now that you have been arrested on the warrant * * *
> I am here to impose that sentence.
>
> And I do want you to understand, sir, that was the sentence of the Court
> after that hearing, that on the count of attempt first degree murder, you are
> sentenced to 24 years in the Illinois Department of Corrections. There was a credit
> that you were entitled to based upon the time spent in custody originally in the
> Cook County Department of Corrections that totaled 340 days credit.

"Your attorney and the State's Attorney have calculated the time that you were held in custody in Israel * * *. That total time was 1593 days. So, the total combined time you will be granted credit for [is] 1,933 days credit."

At that point, the court informed defendant of his right to move to reconsider the sentence within 30 days.

¶ 36     On November 19, 2018, the trial court entered a corresponding written order which imposed a 24-year sentence upon count I but reflected the revised credit for 1933 days of time served. On December 18, 2018, defendant filed a written motion to reduce his sentence. The trial court denied that motion on January 8, 2019, finding that the 24-year sentence imposed *in absentia* in 2005 was "fair and just."

¶ 37     On January 22, 2019, defendant filed a second notice of appeal (the 2019 NOA), which indicated that he sought to challenge the 2005 conviction and his sentence. The 2019 NOA lists the date of the judgment appealed from as "7-28-05/1-18-19", referencing the 2005 date of conviction and the January 2019 date that his motion to reconsider sentence was denied.

¶ 38     Defendant filed his opening brief on October 29, 2019. The State filed its response on May 20, 2020, and defendant filed a reply on May 29, 2020. The parties' initial briefs did not reference the 2005 NOA or its potential impact on appellate jurisdiction. On our own motion, we issued an order on January 11, 2021, directing the parties to submit supplemental briefs on the following issues: (1) "whether the 2005 NOA deprived the circuit court of jurisdiction to enter subsequent orders in this case, including the November 2018 sentencing order and the January 2019 denial of defendant's motion to reduce sentence" and (2) "in light of the 2005 NOA, whether our court has

jurisdiction to reach the merits of the issues briefed in this appeal." Defendant and the State submitted supplemental briefing on those questions.

¶ 39     In this appeal, defendant first contends that the State failed to prove his guilt beyond a reasonable doubt. Alternatively, he argues that his 24-year sentence was excessive when it was imposed in 2005. Notably, he does not raise any challenge to the November 2018 sentencing order adjusting his sentencing credit or the January 2019 denial of his motion to reduce sentence.

¶ 40     As a threshold matter, we recognize our independent duty to consider our own jurisdiction. *People v. Lewis*, 234 Ill. 2d 32, 36-37 (2009); *People v. Smith*, 228 Ill. 2d 95, 103 (2008). Given the unique procedural history of this case—including two notices of appeal filed in 2005 and 2019—we discuss the basis for our jurisdictional conclusions. Specifically, we find that (1) we have jurisdiction to reach the merits of defendant's challenges to his conviction and the sentence imposed in 2005; (2) the trial court retained jurisdiction to adjust defendant's sentencing credit in 2018, but (3) the trial court did not have jurisdiction to consider defendant's subsequent motion to reduce sentence, rendering void its January 2019 order on that motion.

¶ 41     We first conclude that the 2005 NOA provides jurisdiction to reach defendant's challenges to the underlying conviction and original imposition of his sentence. "For the appellate court to have jurisdiction in a criminal case, a notice of appeal must be filed either 30 days from the entry of final judgment, or, if a timely motion is filed challenging a judgment, within 30 days of the entry of an order disposing of such motion." *People v. Salem*, 2016 IL 118693, ¶ 25; see Ill. S. Ct. R. 606(b) (eff. July 1, 2017) ("Except as provided in Rule 604(d), the notice of appeal must be filed with the clerk of the circuit court within 30 days after entry of the final judgment appealed from or if a motion directed against the judgment is timely filed, within 30 days after the entry of

the order disposing of the motion."). The final judgment in a criminal case is the entry of sentence. *Salem*, 2016 IL 118693, ¶ 12. Here, the 2005 NOA was timely, as it was filed within 30 days of the imposition of sentence on September 1, 2005. Based on the 2005 NOA, we have jurisdiction to review defendant's challenges to his 2005 conviction and sentence. See Ill. S. Ct. R. 606(a) ("No step in the perfection of the appeal other than the filing of the notice of appeal is jurisdictional."); *People v. Abdullah*, 2019 IL 123492, ¶ 21 ("A timely filed notice of appeal is the only jurisdictional step required to confer jurisdiction upon the appellate court.").[3]

¶ 42    Our jurisdictional analysis does not end there, given the additional proceedings in the circuit court after defendant's return to Illinois. Notwithstanding the pendency of the 2005 NOA, the trial court entered separate orders in 2018 and 2019 adjusting defendant's sentencing credit for time in detention overseas, and then denying his subsequent motion to reduce sentence. Only the first of these orders was permissible. Generally, " '[w]hen the notice of appeal is filed, the appellate court's jurisdiction attaches *instanter*, and the cause is beyond the jurisdiction of the trial court.' " *Abdullah*, 2019 IL 123492, ¶ 21 (quoting *People v. Bounds*, 182 Ill. 2d 1, 3 (1998)). One exception to this rule is that "even after it has otherwise lost jurisdiction, the trial court retains jurisdiction to amend a mittimus to reflect additional sentencing credit." *People v. O'Neil*, 367 Ill. App. 3d 439, 440 (2006); see also Ill. S. Ct. R. 472(a) (eff. May 17, 2019) (stating that the circuit court retains

---

[3] We note that, although defendant was tried and sentenced *in absentia* pursuant to section 115-4.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-4.1 (West 2004)), that did not preclude the 2005 NOA from conferring jurisdiction. See *People v. Partee*, 125 Ill. 2d 24, 33 (1988) ("Nothing in our rules suggests that a section 115-4.1 conviction and sentence is nonfinal, or that the appellate court lacks jurisdiction to hear an appeal from it. Indeed, the rules specifically provide that 'no step in the perfection of the appeal other than the filing of the notice of appeal is jurisdictional.' [Citation.]").

jurisdiction to correct errors in the calculation of sentencing credit "at any time following judgment * * *, including during the pendency of an appeal"). Thus, notwithstanding the pendency of the 2005 NOA, the circuit court retained jurisdiction to enter the 2018 order granting defendant additional sentencing credit based on his time spent in custody overseas.

¶ 43    On the other hand, the trial court lacked jurisdiction to rule upon defendant's December 2018 motion to reduce his sentence, given the pendency of the timely 2005 NOA.[4] In turn, the 2019 order denying the motion to reduce sentence was void. *People v. Flowers*, 208 Ill. 2d 291, 306-07 (2003) ( "A ruling made by the circuit court in the absence of subject matter jurisdiction is void. [Citation.]"). Our supreme court instructs that, under these circumstances, this court should vacate the void order and dismiss any appeal therefrom. *Id*. at 307 ("Because the circuit court had no jurisdiction to entertain that [untimely] motion, the appellate court should simply have vacated the circuit court's judgment and dismissed Flowers' appeal.") Accordingly, we vacate the January 8, 2019 order denying defendant's motion to reduce sentence and dismiss the corresponding 2019 NOA.

¶ 44    However, that conclusion does not affect our ability to reach the merits of the appeal. The timely 2005 NOA independently affords jurisdiction to reach the merits of defendant's challenges

---

[4] Even without the 2005 NOA, the trial court would otherwise lack jurisdiction to reduce the 2005 sentence more than a decade later. It is well-settled that "once cases are heard and determined, '[t]he jurisdiction of trial courts to reconsider and modify their judgments is not indefinite.' " *People ex rel. Alvarez v. Skryd*, 241 Ill. 2d 34, 40 (2011) (quoting *People v. Flowers*, 208 Ill. 2d 291, 303 (1983)). Rather, the circuit court generally loses jurisdiction to modify a sentence 30 days after the sentence is imposed. *Id.* "A motion [to modify a sentence] not filed within that 30-day period is not timely." 730 ILCS 5/5-4.5-50(d) (West 2018).

to his conviction and the sentence imposed in 2005, and thus we proceed to address those contentions.

¶ 45    Turning to the merits, we first address defendant's claim that the State failed to prove his guilt beyond a reasonable doubt. The standard of review is well-settled: "When reviewing a challenge to the sufficiency of the evidence, this court considers whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007).

¶ 46    Because the "trier of fact is best equipped to judge the credibility of witnesses," "a jury's findings concerning credibility are entitled to great weight." *Id.* at 114-15. "The reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses. [Citation.]" *People v. Corral*, 2019 IL App (1st) 171501, ¶ 71. "Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. [Citation.]" *Id.* ¶ 72.

¶ 47    In this case, defendant does not specify whether he challenges the findings of guilt for the offense of attempted murder, aggravated battery, or both. However, defendant was only sentenced on the offense of attempted murder (count I), and thus our jurisdiction only extends to that conviction. See *People v. Relerford*, 2017 IL 121094, ¶ 71 (recognizing that appellate jurisdiction extends only to final judgments, and there is no final judgment in a criminal case unless sentence has been imposed).

¶ 48    Notably, defendant also does not specify any particular element of the offense for which the evidence was lacking. Rather, he suggests that the testimony of Abdallah, Qader, and Johnson identifying him as the shooter was unreliable or lacked credibility. He otherwise asserts that there was a lack of physical evidence.

¶ 49    After viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have concluded that defendant was guilty beyond a reasonable doubt. The record shows that three witnesses, including Johnson, who was riding in the same car as defendant, identified him as the shooter. Johnson described how after the shooting defendant wiped the gun with his shirt and disposed of it. The gun was recovered by police, and the parties stipulated that the bullet recovered from the Lexus was fired from the gun.  An expert witness analyzed the gunshot residue kit collected from defendant and concluded that defendant discharged a firearm, contacted an item with gunshot residue, or was in close proximity to a firearm when it was discharged. This evidence is not so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt.

¶ 50    Defendant nevertheless suggests that Abdallah's account of the incident, including his identification of him, was unreliable. He argues that Abdallah's testimony indicated the "entire interaction" between the cars was brief and that the total opportunity for him to identify the shooter was "a matter of seconds." Defendant further claims that Abdallah was talking on his cell phone during the entire incident.

¶ 51    We do not find these concerns persuasive. A single witness's identification is sufficient to sustain a conviction "if the witness viewed the accused under circumstances permitting a positive identification." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 47. Although not cited by defendant,

it is well-settled that in assessing identification testimony, this court considers the following five factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972): (1) the witness's opportunity to view the defendant during the offense; (2) the witness's degree of attention at the time of the offense; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty at the subsequent identification; and (5) the length of time between the crime and the identification. *People v. Slim*, 127 Ill. 2d 302, 307–08 (1989). None of these factors, standing alone, conclusively establishes the reliability of identification testimony; rather, the trier of fact is to take all of the factors into consideration. *Biggers*, 409 U.S. at 199–200. Further, "[e]yewitness testimony is insufficient only if the record compels the conclusion that no reasonable person could accept the testimony beyond a reasonable doubt." *People v. Charles*, 2018 IL App (1st) 153625, ¶ 25.

¶ 52     Viewing the evidence in the light most favorable to the State, a rational trier of fact could find Abdallah's identification reliable. To the extent defendant suggests that the encounter was too brief, we note that even identifications made during brief encounters may be found credible. See, *e.g.*, *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 32 (identification testimony credible even when "the entire incident took less than one minute") (citing *People v. Parks*, 50 Ill. App. 3d 929, 932-33 (1977) (identification from attack lasting "five to ten seconds" sufficient to sustain conviction))). Further, although Abdallah acknowledged that he was initially on his phone, he did not suggest that he was on the phone during the entire incident. Indeed, he testified that he dropped the phone after Qader touched him, and only *then* he saw defendant with the gun. The day after the shooting, Abdallah identified defendant as the shooter from a physical lineup. The jury was entitled to credit Abdallah's testimony that he saw defendant, and we will not second-guess that finding.

¶ 53    Defendant also notes that Abdallah "admitted that he did not remember things about that evening." However, even gaps or inconsistences in his narrative did not preclude the jury from crediting the bulk of his testimony. "The trier of fact is free to accept or reject as much or as little of a witness's testimony as it pleases." *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67; see also *Corral*, 2019 IL App (1st) 171501, ¶ 85 ("Minor inconsistencies in the testimony between witnesses or within one witness's testimony may affect the weight of the evidence but do not automatically create a reasonable doubt of guilt"). We further note that, even if the jury had doubts about Abdallah's recollection, two other witnesses corroborated his testimony.

¶ 54    Defendant's criticisms of Qader's testimony are similarly unavailing. Defendant suggests that Qader's account was not reliable because he acknowledged that the front passenger seat in the Lexus was reclined. He also suggests that Qader's testimony was inconsistent with respect to his description of the gunman. Defendant points out that "when police brought Qader to the location of the red car, Qader identified the only male at the scene." Nevertheless, it was the jury's role to assess what weight (if any) should be given to such details in evaluating Qader's credibility. *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 21 ("The trier of fact assesses the credibility of witnesses, determines the weight of the testimony and resolves conflicts or inconsistencies in the evidence."). The jury was entitled to credit Qader's testimony, which was detailed, unequivocal, and consistent with other eyewitness accounts.

¶ 55    With respect to Johnson, defendant emphasizes her acknowledgment at trial that she did not want to "get in trouble" after police detained her. He argues that this "skews" the reliability of her testimony, but he does not articulate how it would adversely affect her reliability or truthfulness. In any event, it was the jury's role to assess what impact, if any, this had on the weight

to be afforded her testimony, and we will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses. *Corral*, 2019 IL App (1st) 171501, ¶ 71.

¶ 56     In sum, we reject defendant's invitation to reweigh the jury's assessment of credibility with respect to Abdallah, Qader, and Johnson. Despite defendant's arguments, we cannot say that no reasonable jury could accept the testimony beyond a reasonable doubt. See *Charles*, 2018 IL App (1st) 153625, ¶ 25. To the contrary, the jury could certainly credit the testimony of those three witnesses, all of whom unequivocally identified defendant as the shooter and whose testimony was corroborated by the physical evidence presented.

¶ 57     Defendant's remaining contentions regarding the sufficiency of the evidence are also unavailing. Defendant notes Officer Pawlowski's testimony that he did not see an object thrown from the Ford, the lack of fingerprint evidence, and Rochowicz's admission that gunshot residue could hypothetically have been transferred to defendant's hands by a source other than a gun. However, the absence of definitive physical evidence linking defendant to the gun does not necessarily create a reasonable doubt, especially since "[a] single eyewitness identification can support a conviction if the witness viewed the accused under circumstances permitting a positive identification." *People v. Donahue*, 2014 IL App (1st) 120163, ¶ 93. In this case, there were three such identifications. In short, the evidence presented and the reasonable inferences therefrom, was sufficient to sustain defendant's conviction. *Corral*, 2019 IL App (1st) 171501, ¶¶ 71-72.

¶ 58     We next consider whether the trial court abused its discretion in sentencing defendant to 24 years' imprisonment for attempted first-degree murder.

¶ 59    Under the Illinois Constitution, the trial court must impose a sentence that balances the seriousness of the offense and the defendant's rehabilitative potential. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. The court must consider aggravating and mitigating factors including "the nature and circumstances of the crime, the defendant's conduct in the commission of the crime and the defendant's personal history," including his age and criminal history. *Id.* Because the trial court is in the best position to weigh these factors, the sentence imposed "is entitled to great deference and will not be reversed absent an abuse of discretion." *Id.* "A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the sprit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20.

¶ 60    Attempted first-degree murder is a Class X felony. 720 ILCS 5/8-4(c) (West 2004). In turn, the applicable sentencing range is between 6 and 30 years' imprisonment. 730 ILCS 5/5-8-1(a)(1) (West 2004). As defendant's 24-year sentence was within statutory guidelines, it is "presumed to be proper and will not be disturbed absent an affirmative showing that the sentence is at variance with the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense." *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 61    Defendant cannot make this showing. Defendant suggests that the trial court's remarks at his September 1, 2005 sentencing hearing show that it failed to consider mitigating aspects of his history or his rehabilitative potential, but "focused on the nature and circumstances of the offense." Defendant's contentions are not persuasive. First, simply because the trial court did not discuss mitigating factors does not mean that the trial court ignored them. *Knox*, 2014 IL App (1st) 120349, ¶ 46 ("[B]ecause a trial court need not explicitly analyze each relevant factor or articulate the basis

for the sentence imposed, when mitigating evidence is presented before the trial court, it is presumed that the court considered that evidence" in imposing sentence.). Further, other than his age, defendant identifies no mitigating factors or evidence of rehabilitative potential presented to the trial court.

¶ 62    In any event, it is well-settled that a defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense. *People v. Alexander*, 239 Ill. 2d 205, 214 (2010). Defendant does not dispute that the offense was serious. Moreover, the court, in imposing sentence, explicitly relied on defendant's lengthy criminal history. See *People v. Evangelista*, 393 Ill. App. 3d 395, 399 (2009) ("criminal history alone" may warrant a sentence "substantially above the minimum."). We cannot say that the court abused its discretion in finding that these factors warranted a "substantial" sentence of 24 years' imprisonment.

¶ 63    Finally, there is no merit to defendant's suggestion that the trial court impermissibly "relied on an element of an offense as a factor in aggravation." Defendant claims the trial court's comments show that it sentenced him "based on the potential harm of firing a handgun from a motor vehicle" and suggests that discharging a firearm from a vehicle was an element of the offense. This argument is unpersuasive for multiple reasons. We first note that there is nothing in the trial court's comments suggesting that its sentencing determination specifically relied on the particular fact that defendant fired shots from a car. Rather, the trial court simply referenced "the facts that were adduced during the course of this jury trial" and defendant's criminal history of "guns and violence" before remarking that he was a grave threat to the community. See *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 52 (the trial court may properly comment upon the "nature and circumstances of the offense" in explaining its sentencing decision).

¶ 64    Moreover, in claiming that the court improperly relied on an element of an offense, defendant erroneously relies on the statute defining aggravated *assault*. 720 ILCS 5/12-2(c)(3) (West 2018) (specifying that aggravated assault is committed when a person "[d]ischarges a firearm from a motor vehicle" while committing an assault). In this case, defendant was charged and convicted of aggravated *battery* with a firearm; discharging a firearm from a motor vehicle was not an element of that offense. See 720 ILCS 5/12-4.2 (West 2002). Finally, defendant was sentenced upon his conviction for attempted murder, not aggravated battery, which independently precludes his double enhancement argument. See *People v. Phelps*, 211 Ill. 2d 1, 11 (2004) ("[A] factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing *for that offense*." (Emphasis added.)). Defendant's challenge to his sentence is thus without merit.

¶ 65    In sum, we vacate as void the trial court's order of January 8, 2019, denying defendant's motion to reduce sentence. We otherwise affirm defendant's conviction and the trial court's original imposition of defendant's 24-year sentence in 2005.

¶ 66    For the foregoing reasons, we vacate the trial court order of January 8, 2019, but otherwise affirm the judgment of the circuit court of Cook County.

¶ 67    Vacated in part; affirmed in part.