2018 IL App (1st) 153625

First District
Second Division
December 26, 2018

No. 1-15-3625

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, |
| | ) | |
| v. | ) | No. 11 CR 5692 |
| | ) | |
| JAMAAL CHARLES, | ) | Honorable |
| | ) | Neera L. Walsh, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.
Justices Lavin and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Jamaal Charles was convicted of aggravated criminal sexual assault with a firearm and aggravated kidnapping with a firearm and sentenced to two consecutive 22-year prison terms. On appeal, he contends that the evidence was insufficient to establish that he was armed with a firearm during the offenses. He also maintains that the court abused its discretion in allowing the State to introduce, as impeachment, his prior conviction for aggravated unlawful use of a weapon (AUUW), and claims that counsel was ineffective for not properly challenging the admission of that prior conviction. Lastly, he contends that his sentences are excessive. We disagree that the evidence was insufficient to support the jury's finding that Charles was armed with a firearm and find that admission of respondent's AUUW

conviction, while erroneous, was harmless beyond a reasonable doubt. We further reject the challenge to the length of Charles's sentence. Accordingly, we affirm.

¶ 2     Charles was charged with aggravated criminal sexual assault for committing an act of sexual penetration upon R.G. by force or threat of force. One count alleged that Charles was armed with a firearm, and another alleged that he threatened or endangered R.G.'s life by pointing a gun at her. Charles was also charged with aggravated kidnapping for allegedly carrying R.G. from one place to another by force or threat of force with the intent to secretly confine her against her will. One count alleged that he was armed with a firearm, and another alleged that he kidnapped R.G. while committing criminal sexual abuse against her.

¶ 3     At about 4 a.m. on August 10, 2010, R.G. left her sister's home at 2815 East 81st Street in Chicago to go to work at a retail store on north Michigan Avenue, where she had to arrive before 6 a.m. As she waited alone for a bus, with nobody else on the street, a car passed her, turned around, and stopped in front of her. Charles, the driver and sole occupant, tried to get her attention but she ignored him. He then pointed a black gun at her and ordered her into his car. Charles pointed the gun at her from "[o]nly a few feet" away and she saw "[t]he barrel of the gun," where "bullets" come out. She entered the car "[b]ecause I was scared *** for my life." When she did so, the gun was in Charles's lap. He put the gun in the back seat behind the driver's seat, not in a case or holster, where it was "[n]ot far at all" from him and "[i]n arm's reach." As he drove, he said he "wasn't going to hurt" her. He stopped the car on a deserted residential street and ordered her to remove her pants and lift her shirt. "Because he had a gun," R.G. did exactly as he said. He placed his mouth and tongue on her breasts, and then on and into her vagina, over several minutes. She obeyed him "[b]ecause I was scared for my life." Afterwards, she put her pants on and Charles drove the car away. Charles tried to start a

conversation with R.G., but she said that she needed to be at work so he should let her go. Charles offered to take her to work, but she said that dropping her at the Red Line would suffice as they were near a station. As they went towards the station, Charles gave his name as Marlon and offered his telephone number. R.G. entered it into her telephone because it could be evidence. Charles asked her to call him at that number, and R.G. did.

¶ 4    When they reached the station, R.G. went inside "as fast as I could." Realizing she did not have her transit card, she bought one so she could pass through the turnstile into the station. She called her sister, "crying and just really shooken up." As she was on the telephone, Charles entered the station and told her that she had left her transit card in his car. She noticed that Charles walked with a limp. She was "frozen" and did not scream or flee but took the card from him. He then left. At her sister's urging, she went to the station agent's booth. She then called 911, and called her father to pick her up at the station. Both R.G.'s sister, who was speaking to R.G. when Charles returned to the station, and her father confirmed that she was "hysterical" when she called them. The police came to the station and spoke with R.G. Her father arrived and took her to a hospital. She was examined and swabs were taken from her breasts and vagina. R.G. described the attack to the nurse who took the samples. After police spoke with R.G. at the hospital, they were looking for a gray Chevrolet Monte Carlo and a man fitting a description R.G. had given them. When a coworker arrived at R.G.'s house later that day, R.G., who was "very dependable," "hardworking," and "responsible," "couldn't stop crying."

¶ 5    In January 2011, police showed R.G. a photographic array, and she identified Charles as her assailant. She viewed a lineup in March 2011 and likewise identified Charles as her assailant.

¶ 6 DNA on "bite mark swabs" from R.G. matched Charles's DNA, with such a match occurring in one in 1.5 quadrillion black persons, 150 quadrillion Hispanic persons, or 240 quadrillion white persons.

¶ 7 Before trial, the State filed a motion *in limine* to introduce as impeachment, if Charles testified, his prior conviction for AUUW in case 07 CR 10826, for which he received two years' probation in 2008. The State argued the conviction's probative value outweighed any unfair prejudice. Charles contended that (i) AUUW "could be as benign as possessing a handgun on the CTA," (ii) AUUW "has been declared in another form to be unconstitutional under the Second Amendment to the US Constitution by the 7th Circuit Court of Appeals," and (iii) no scientific evidence links gun ownership to untruthfulness. The court granted the motion, finding the conviction to be more probative than prejudicial. The court instructed the State to ensure that the certified copy of the AUUW conviction did not specify the weapon and noted that the jury would be instructed on the limited purpose of impeachment for which the conviction would be admitted. After presenting witnesses who testified to the evidence summarized above, the State rested.

¶ 8 Charles moved for a directed verdict, arguing in part that no gun was recovered and so the State had not sustained its burden to prove that a weapon was used in the commission of the offense. The court denied the motion, finding that a reasonable trier of fact could find every element of the charged offenses.

¶ 9 Charles elected to testify and related that at about 3 or 4 a.m. on August 10, 2010, he went alone in his Monte Carlo coupe to an all-night restaurant to get a meal. He was driving from the restaurant when he saw "a female" standing at a bus stop, who he identified at trial as R.G. He stopped and chatted with her, and she gave her nickname as ReRe and said she was

going to a friend's house and was not in a "hurry" to get there. He gave his proper name, Jamaal, and denied identifying himself as Marlon. He offered her a ride, and she accepted. He took her to his aunt's home, where his aunt, irritated that he had arrived in the middle of the night, admitted him and R.G. After the aunt returned to her bedroom, Charles and R.G. ate together and then went to another bedroom where she provided him a condom and they voluntarily had "sexual activity" with "foreplay" beforehand. He admitted that he placed his mouth on her breasts and vagina during this activity. Afterwards, Charles offered to drive R.G. elsewhere and she asked to be brought to a Red Line station. As he drove to the station, he asked for her telephone number and she gave it to him. She did not ask for his number. R.G. asked him for $150 or $175 and they had a "verbal altercation" regarding Charles's inability to pay her. After leaving her at the station, Charles realized that R.G.'s transit card was in his car. He returned to the station to give R.G. her card. When he did so, she was not crying or talking on the telephone, and she did not flee or cry out upon seeing him. Charles denied showing R.G. a gun at any time.

¶ 10    In rebuttal, the State offered into evidence a certified copy of Charles's 2008 AUUW conviction in case 07 CR 10826. Defense counsel made no objection, and the court admitted the conviction into evidence. The offense was named on the record as aggravated unlawful use of a weapon, but no reference to a firearm was made by the court, the prosecutor, or defense counsel.

¶ 11    In closing argument, the State argued that Charles's conduct in displaying a firearm created fear in R.G. that induced her compliance during the offense and her "frozen" state when he reappeared at the CTA station. After summarizing the State's evidence in detail, the State argued that Charles's account of events was impeached by the State's evidence and by Charles's status as "a convicted felon." Defense counsel, arguing at length that Charles's version of events was credible, emphasized that no gun was ever recovered: "There is no gun in this case."

Charles's theory in closing was that R.G. had succumbed to her "desires" and, having regrets afterwards, made up the story about the attack. In rebuttal argument, the State labeled Charles's account "ridiculous" and argued that (i) Charles's timeline of events was contradicted by various State witnesses and (ii) the jury should not find "a convicted felon" more credible than the State's witnesses.

¶ 12    The jury was instructed that "[e]vidence of the defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offense with which he is charged."

¶ 13    During deliberations, the jury sent a note asking for "the gun conviction." After consulting the parties, the court provided the jury a redacted copy of the AUUW conviction. The jury's copy stated the name of the offense—aggravated unlawful use of a weapon—and the date of conviction but did not mention a firearm. It also did not mention the sentence, or that the State elected not to proceed on another count of AUUW.

¶ 14    The jury found Charles guilty of aggravated criminal sexual assault with a firearm, aggravated criminal sexual assault while threatening or endangering R.G.'s life, aggravated kidnapping with a firearm, and aggravated kidnapping while committing criminal sexual abuse.

¶ 15    In his posttrial motion, Charles challenged the sufficiency of the evidence and the order *in limine* allowing his AUUW conviction into evidence. Regarding the latter, he argued that he was prejudiced by evidence of a prior weapons case when he was being accused in part of being armed with a firearm and that the court could have admitted into evidence that he had a prior felony conviction without specifying the offense. Following arguments by the parties, the court denied the motion. Regarding Charles's prior conviction, the court found that it properly exercised its discretion in weighing the probative value and prejudicial effect of the AUUW

conviction and that the conviction was admitted not for propensity but strictly regarding credibility.

¶ 16    The presentence investigation report (PSI) indicated that Charles, born in March 1987, had three prior convictions: for AUUW in 2008 and two cannabis offenses in 2006 and 2015. He was raised by both his parents in a "normal" childhood with no abuse, and he still had a close relationship with his parents and nine siblings. Charles was never married and had no children. He completed elementary school, attended but did not complete high school, and was attending GED classes before his incarceration. He intended to obtain his GED and learn the trade of auto body repair. He was working when he was arrested for the instant offenses and had worked two sales jobs in 2001-02 and 2003-04. Charles denied gang membership and claimed poor physical health due to gunshot wounds sustained in 2005. He claimed mental health issues—depression and suicide attempts—since his arrest, and professed to be taking his prescribed medications but claimed that he could not recall his mental health diagnosis. He admitted drug use from age 13 and alcohol use from age 16, and denied receiving substance abuse treatment.

¶ 17    At the October 2015 sentencing hearing, a sheriff's deputy testified for the State that in a courthouse lockup earlier that day, Charles masturbated through the bars of his cell in her presence.

¶ 18    R.G. submitted a victim-impact statement, describing her loss of confidence and self-esteem since the assault. Until she moved to another city, she lived near the site of the assault so she was "constantly being reminded of the horror I went through." She felt "extremely paranoid and scared" waiting for transit even with other people. The attack impacted her work and personal lives, and she has difficulty sleeping and panic attacks "to this day."

¶ 19    Charles elected to not address the court.

¶ 20    In aggravation, the State argued the ongoing impact of Charles's offenses upon R.G. The State asked for a "significant" sentence, noting that Charles faced two consecutive prison terms of 21 to 45 years each with firearm enhancements.

¶ 21    Defense counsel argued in mitigation that the minimum sentences were unconstitutionally disproportionate to Charles's offense of merely "a tongue touching skin" with no bruises or bleeding and no testimony that Charles struck R.G. Counsel noted that Charles returned R.G.'s transit card, which counsel characterized as "thoughtful if not compassionate," and argued that R.G. not fleeing in terror upon his return belied her professed fear. Counsel argued that Charles's "aberrant sexual conduct" before the sentencing hearing, and the absence of violence, indicated his need for treatment of his "untreated mental illness" of "sexual drive" that a long prison sentence would not resolve. Regarding Charles's AUUW conviction, counsel noted that it was for mere possession, and "maybe he didn't have a FOID card and maybe he displayed [the gun] when he shouldn't have," but it should not aggravate his sentence beyond the minimum. Counsel argued that the rest of the PSI "also favors the minimum" because he "doesn't have a violent past" and had never gone to prison before. Counsel asked the court to disregard the sentencing statutes and sentence Charles to "time considered served."

¶ 22    The court noted that it considered the arguments, statutory aggravating and mitigating factors, the PSI, and sentencing evidence including the victim-impact statement. The court found that Charles's offenses involved violence. It noted that he could receive therapy or treatment in prison but "this is the first time I'm hearing" about him having such issues. The court declined to disregard the sentencing statutes as unconstitutional. It sentenced Charles to 22 years' imprisonment each for aggravated criminal sexual assault with a firearm and aggravated kidnapping with a firearm (one year over the minimum sentence for each offense), to be served

consecutively, and merged the other counts. Charles filed a motion to reconsider the sentence, which the court denied. This appeal followed.

¶ 23 The record has been supplemented by Charles with the indictment in case 07 CR 10826, showing that he was charged with two counts of AUUW, both based on possessing an uncased, loaded, and immediately accessible firearm when he was not on his own land or in his own abode or fixed place of business. 720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2006). This form of AUUW was declared facially unconstitutional in *People v. Aguilar*, 2013 IL 112116, ¶ 22.

¶ 24 Charles first contends that the evidence was insufficient to prove beyond a reasonable doubt that he was armed with a firearm during the offenses so that his convictions should be reduced to aggravated criminal sexual assault and aggravated kidnapping (without a firearm) and his case remanded for resentencing.

¶ 25 On a claim of insufficient evidence, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. The factfinder—here, the jury—has the responsibility to weigh, resolve conflicts in, and draw reasonable inferences from the testimony and other evidence. *Id.* We will not substitute our judgment for that of the jury regarding witness credibility or the weight of evidence. *Id.* Positive and credible testimony by a single witness is sufficient to convict, even if contradicted by the defendant. *Id.* ¶ 36. Eyewitness testimony is insufficient only if the record compels the conclusion that no reasonable person could accept the testimony beyond a reasonable doubt. *Id.* Similarly, the trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances; it is sufficient if the evidence as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. A jury is

not required to disregard inferences that flow normally from the evidence, seek all possible explanations consistent with innocence and elevate them to reasonable doubt, or find a witness not credible merely because the defendant says so. *Id.*; *Gray*, 2017 IL 120958, ¶ 36. We will reverse a conviction only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt as to defendant's guilt remains. *Gray*, 2017 IL 120958, ¶ 35.

¶ 26    A person commits aggravated criminal sexual assault when he commits an act of sexual penetration using force or the threat of force while armed with a firearm. 720 ILCS 5/12-13(a)(1), 12-14(a)(8) (West 2010). A person commits aggravated kidnapping when he, by force or threat of force and while armed with a firearm, carries another person from one place to another intending to secretly confine her against her will. *Id.* §§ 10-1(a)(2), 10-2(a)(6). For these offenses, a firearm is a device "designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas" except for air-guns and spring-guns firing "a single globular projectile" of no more than 0.18 inches at less than 700 feet per second, paintball guns, flare guns, nail and rivet guns, and antique firearms designated by the State Police. *Id.* § 2-7.5 (citing 430 ILCS 65/1.1 (West 2010)).

¶ 27    Our supreme court has addressed the issue of the sufficiency of the evidence from which a trier of fact may infer that an object used in a crime was a gun or firearm. In *People v. Washington*, 2012 IL 107993, the court found that the victim's unimpeached testimony may be sufficient to sustain the State's burden to show that defendant was armed with a gun during the offense. The *Washington* court affirmed convictions for (in relevant part) aggravated kidnapping and armed robbery when the victim had a clear view of the object pointed at him and testified that it was a gun, though (i) no gun or gun-like object was recovered and (ii) the defense argued

insufficient evidence of a gun or firearm from the absence of a recovered object. *Id.* ¶¶ 10-11, 15-18, 34-37. The *Washington* victim

> "testified that defendant pointed a gun at him, forced him into the truck, and then held a gun to his head while he sat between defendant and his accomplice in the front of the truck. [The victim] also testified that defendant pointed the gun at him when he was later forced into the cargo area of the truck. This evidence established that, for several minutes, [the victim] had an unobstructed view of the weapon defendant had in his possession during the commission of the crimes. He testified that it was a gun." *Id.* ¶ 35.

Given the *Washington* victim's "unequivocal testimony and the circumstances under which he was able to view the gun, the jury could have reasonably inferred that defendant possessed a real gun." *Id.* ¶ 36.

¶ 28    Most recently, in *People v. Wright*, 2017 IL 119561, ¶¶ 71-77, our supreme court determined that its rationale in *Washington*, considering a version of the armed robbery statute referring broadly to a "dangerous weapon," applied to the present statute specifically concerning a "firearm":

> "In finding that the evidence proved that the defendant in *Washington* possessed 'a dangerous weapon,' we relied on the testimony of a single eyewitness and concluded that a rational trier of fact could infer from the testimony that the defendant possessed a 'real gun.' Our disposition is controlled by the same rationale here." *Id.* ¶ 76.

In *Wright*, three witnesses described the object at issue as a gun, and two of them testified to experience or familiarity with guns and gave a further description of the gun. *Id.* Thus, our supreme court found the evidence of armed robbery to be sufficient. *Id.* ¶ 77.

¶ 29 This court has also considered the sufficiency of the evidence from which a trier of fact may infer that an object used in a crime was a gun or firearm. In *People v. Malone*, 2012 IL App (1st) 110517, ¶¶ 4, 51, a witness who testified to seeing a defendant holding a black, or black and silver gun during a robbery, and hearing " 'something heavy hit the counter' " when the defendant rested the gun on a counter, admitted " '[t]hat was the first one' " she had ever seen. We affirmed the defendant's armed robbery conviction over the defendant's arguments that the witness did not provide a detailed description of the gun and did not testify that the robber threatened to kill her. *Id.* ¶¶ 41, 52. In *People v. Davis*, 2015 IL App (1st) 121867, ¶ 11, two witnesses to separate robberies testified to the defendant holding a "big," "dark-colored" gun in one incident and a "silver," "shiny," and "real gun" in the other, with both witnesses denying that the gun they saw was the toy gun found when defendant was arrested, and the witness to the first incident admitting an unfamiliarity with guns. We found this evidence sufficient under *Washington* and *Malone* to reasonably infer the defendant's use of a gun in both incidents. *Id.* ¶ 12; see also *People v. Jackson*, 2016 IL App (1st) 141448, ¶ 17 ("reviewing courts have upheld trial court determinations that the defendant possessed a firearm even where very little description of the weapon was presented" and that cases containing more detailed descriptions of firearms "do not establish a minimum requirement for showing a defendant possessed a firearm"). While *Malone*, *Davis*, and *Jackson* preceded our supreme court's decision in *Wright*, nothing in *Wright* suggests that familiarity with firearms and the ability to distinguish among various types of firearms is necessary to find a witness's testimony that a defendant possessed a firearm sufficient. We therefore see no reason not to follow our pre-*Wright* opinions.

¶ 30 Taking the evidence presented at Charles's trial in the light most favorable to the State, a rational trier of fact could have found that Charles was armed with a firearm during the sexual

assault and kidnapping offenses. R.G., whom the jury found credible, repeatedly referred to the object that Charles pointed at her and kept within his reach in the car as a gun. She described it as a black gun and noted that the barrel was pointed at her from a few feet away. Consistent with *Washington*, *Wright*, and *Malone*, the jury could reasonably infer from such evidence that the object was a firearm, particularly since Charles was using it to compel R.G. to enter his car. Against this conclusion, Charles's brief raises the possibility that the object was perhaps a BB gun or another look-alike object that does not meet the technical definition of "firearm." See 720 ILCS 5/2-7.5 (West 2010); 430 ILCS 65/1.1 (West 2010) (defining "firearm" as any device "designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas"). But, as noted, we need not elevate all *possible* explanations consistent with innocence (here, insufficiency of an element of the offense) to the level of reasonable doubt. This is particularly true here, as Charles's defense at trial was that he was unarmed and that R.G. agreed to get into his car and later have sex with him. And since it would have conflicted with his defense that the sex was consensual, Charles never requested jury instructions on lesser included offenses not involving the use of a firearm. Thus, the jury was not asked to consider whether the object Charles pointed at R.G. was a real or a toy gun. Accordingly, we reject Charles's challenge to the sufficiency of the evidence that he was armed with a firearm.

¶ 31    Charles also contends that the trial court erred in admitting his 2008 AUUW conviction as impeachment. Alternatively, he contends that trial counsel was ineffective for not challenging the admission of the AUUW conviction as void under *Aguilar*, 2013 IL 112116, and not objecting at trial to the introduction and use of the conviction.

¶ 32    As a threshold matter, we note that trial counsel objected to the admission of the AUUW conviction at the hearing *in limine*, did not object at trial when the court admitted the conviction

following Charles's testimony, and raised the issue of the AUUW conviction in the posttrial motion. Our supreme court has held that in a criminal case a claim so raised—at the hearing *in limine* and in the posttrial motion but not contemporaneously at trial—is properly preserved. *People v. Denson*, 2014 IL 116231, ¶ 11.

¶ 33     Evidence of a testifying defendant's prior conviction is admissible to attack his credibility if (i) the prior offense was punishable by imprisonment in excess of one year, or involved dishonesty or false statement regardless of the sentencing range, (ii) less than 10 years has elapsed since the later of (a) the date of the prior conviction or (b) the defendant's release from confinement, and (iii) the probative value of admitting the prior conviction outweighs the danger of unfair prejudice. *People v. Mullins*, 242 Ill. 2d 1, 14 (2011). When a defendant's testimony makes up his entire defense so that his credibility is a central issue, his prior convictions are crucial in assessing his credibility. *Id.* at 16. While courts should be cautious in admitting prior convictions similar to the offense charged, similarity alone does not require exclusion of the prior conviction, especially when the jury is instructed to consider the prior convictions for the limited purpose of impeachment. *Id.* The determination of whether a prior conviction is admissible for impeachment purposes is within the trial court's sound discretion. *Id.* at 15.

¶ 34     Evidence of Charles's 2008 AUUW conviction satisfied the threshold requirements for admission: the offense was punishable by imprisonment of more than one year, and it was less than 10 years old at the time of trial. As to the third consideration, when the court admitted the prior conviction over Charles's objection, it expressly found that the conviction's probative value outweighed potential prejudice resulting from its use for impeachment. Moreover, the court gave due consideration to balancing probative value against prejudice when it instructed the State to limit the impeachment to the name of the prior felony offense and not mention the type of

weapon. In closing argument, the State argued in relevant part that Charles's account was not credible because he was "a convicted felon," never referring to the type of offense or even that his conviction concerned possession of a "weapon." The jury was instructed that Charles's prior conviction was to be considered only regarding the credibility of his testimony and not as evidence of his guilt. When the jury asked for a copy of the conviction, it was redacted so that the jury learned the name of the offense but not the weapon used, just as the court had ordered *in limine*. Lastly, while the jury referred to the prior conviction as "the gun conviction," neither the court nor the State ever told the jury that the prior conviction concerned a firearm. We find that the court did not abuse its discretion in balancing the probative value of the conviction against any prejudice resulting from its use for impeachment purposes.

¶ 35    As to the constitutionality of the AUUW conviction under *Aguilar*, trial counsel never established for the trial court that Charles's AUUW conviction was of a type or form rendered unconstitutional by *Aguilar*. When the issue first came up at the *in limine* hearing in February 2013, *Aguilar* had not yet been decided. Charles cited a federal case, *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), with a lengthy dissent (*id.* at 943-954 (Williams, J., dissenting)), where the court stayed its mandate for 180 days to allow our legislature to amend the relevant statutes. *Id.* at 942. So when the trial court first ruled on use of the AUUW conviction for impeachment, our supreme court had not yet agreed with Charles that any form of AUUW is unconstitutional. Moreover, as counsel touched upon at sentencing (" 'maybe he didn't have a FOID card' " (*supra* ¶ 26)), there are types of AUUW that are not unconstitutional. See, *e.g.*, *People v. Mosley*, 2015 IL 115872, ¶¶ 35-38.

¶ 36    The record as supplemented shows that Charles's AUUW conviction was of a type unconstitutional under *Aguilar* and that there was no constitutionally valid AUUW charge

merged into that conviction. But as these events all transpired after the hearing on the State's motion *in limine*, the trial court could not have known of or anticipated them, and so we cannot say the court abused its discretion in admitting the prior conviction for impeachment purposes.

¶ 37   *Aguilar* was, however, decided before Charles's trial, and he argues that his counsel was ineffective for failing to renew his challenge to the admission of his AUUW conviction. In addition, *In re N.G.*, 2018 IL 121939, controlling authority decided during the pendency of this appeal, dictates that Charles's void AUUW conviction was not admissible for any purpose at his trial. According to *In re N.G.*, convictions under facially unconstitutional statutes

> "are illegal and void, a nullity to which no court may give adverse effect in any proceeding against the defendant. They can give rise to no criminal status nor create any legal impediment, for the state had no authority, and the courts never acquired jurisdiction, to impose punishment under such laws to begin with." *Id.* ¶ 73.

Moreover, "[b]ecause they are nonexistent, as a matter of federal constitutional law, and must therefore be ignored by the courts, using them against a defendant in any subsequent proceeding, civil or criminal, is" improper. *Id.* ¶ 74.

¶ 40   A defendant's claim that trial counsel failed to render effective assistance is governed by a two-pronged test, whereby the defendant must establish that (1) counsel's performance fell below an objective standard of reasonableness and (2) the defendant was prejudiced by that performance. *People v. Brown*, 2017 IL 121681, ¶ 25. Prejudice is a reasonable probability that the result of the proceeding would have been different absent counsel's error, and a "reasonable probability" is "defined as a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair." *People v. Patterson*, 2014 IL 115102, ¶ 81 (citing *People v. Evans*, 209 Ill. 2d 194, 220 (2004)). "Satisfying the prejudice prong

necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *Id.* A defendant's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim. *People v. Morgan*, 187 Ill. 2d 500, 529-30 (1999).

¶ 41 Although the State concedes, based on *In re N.G.*, that admission of Charles's 2008 AUUW conviction was, in retrospect, improper, we question whether counsel's performance can be deemed ineffective, given that before *In re N.G.* was decided, the law in Illinois was that unless a defendant's AUUW conviction had been vacated, he remained a convicted felon. *People v. McFadden*, 2016 IL 117424, ¶¶ 30, 37 (reversing appellate court's vacatur of AUUW conviction that served as predicate for defendant's conviction of unlawful possession of a weapon by a felon: "There is nothing absurd or unjust or unreasonable about requiring a person who believes he has been wrongly convicted of a felony to clear his status through the judicial process before being allowed to possess a firearm.").

¶ 42 But even if we assume that Charles has made the requisite showing of defective performance, he cannot on this record satisfy that he was prejudiced as a result. The evidence against Charles was, by any measure, overwhelming. Against R.G.'s account of events— corroborated by her prompt outcry to her sister, father, police, and hospital personnel—Charles offered the fiction that R.G.—a very dependable, hardworking, and responsible person— spontaneously decided, while she was on her way to work, to give in to her "desires," get into a stranger's car, have sex with that person, and then, because she was ashamed, concoct a story that she had been sexually assaulted. Given the alternatives presented to Charles's jury, this was not a credibility duel rendering this case closely balanced. *Cf. People v. Naylor*, 229 Ill. 2d 584, 607 (2008) (for erroneous impeachment by prior conviction, evidence was closely balanced

when two police officers testified to one account, defendant testified to another, and "no extrinsic evidence was presented to corroborate or contradict either version"); *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 43 ("The fact that the jury's verdict rested on an assessment of the credibility of witnesses does not[,] *ipso facto*, make this a closely balanced case, especially where the State offered evidence to corroborate [the victim's] testimony.").

¶ 43   We easily conclude that there is no reasonable probability that the outcome of Charles's trial would have been different had the jury not learned of his 2008 AUUW conviction. We will not speculate, as Charles invites us to, that the jury found he was armed with a firearm based not on R.G.'s testimony, but based on his conviction for possession of a weapon years before his assault on R.G. Therefore, we conclude that this error was harmless beyond a reasonable doubt. Stated another way, our confidence in the jury's verdict is not undermined by the erroneous admission of Charles's AUUW conviction.

¶ 44   Charles's final contention is that his 44-year sentence, consisting of consecutive 22-year prison sentences, is excessive. Charles argues that he should have received the minimum sentence of 42 years, given his youth, his relatively minor criminal history, and the absence of aggravating factors.

¶ 45   Aggravated criminal sexual assault and aggravated kidnapping are Class X felonies, punishable by 6 to 30 years' imprisonment, and each has a mandatory 15-year enhancement when the offense was committed while armed with a firearm. 720 ILCS 5/10-2(a)(6), (b), 12-14(a)(8), (d)(1) (West 2010); 730 ILCS 5/5-4.5-25(a) (West 2010). A defendant convicted of aggravated criminal sexual assault must be sentenced consecutively. 730 ILCS 5/5-8-4(d)(2) (West 2010). Therefore, the minimum prison sentence for each of Charles's offenses was 21 years, or 42 years total.

¶ 46    A sentence within statutory limits is reviewed for abuse of discretion. We may alter a sentence only when it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Jones*, 2018 IL App (1st) 151307, ¶ 72 (citing *People v. Snyder*, 2011 IL 111382, ¶ 36, and *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010)). The trial court has broad discretion, so we cannot substitute our judgment merely because we would weigh the sentencing factors differently. *Id.* The trial court is accorded such deference because it has a superior opportunity to evaluate and weigh a defendant's credibility, demeanor, character, age, mental capacity, social environment, and habits. *Id.*

¶ 47    The trial court must consider both the seriousness of the offense and the defendant's rehabilitative potential. Ill. Const. 1970, art. I, § 11; *People v. Sandifer*, 2017 IL App (1st) 142740, ¶ 81; *People v. Brown*, 2017 IL App (1st) 142877, ¶ 64. While the court may not disregard mitigating evidence, it determines the weight of such evidence. *Brown*, 2017 IL App (1st) 142877, ¶ 63. The most important sentencing factor is the seriousness of the offense, and the court need not give greater weight to rehabilitation or mitigating factors than to the severity of the offense. *Sandifer*, 2017 IL App (1st) 142740, ¶ 82; *Brown*, 2017 IL App (1st) 142877, ¶ 63. Thus, the court need not impose the minimum sentence merely because there are mitigating factors. *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 34. We presume the court considered all mitigating factors on the record, absent an affirmative indication to the contrary, other than the sentence itself. *Sandifer*, 2017 IL App (1st) 142740, ¶ 82; *Brown*, 2017 IL App (1st) 142877, ¶ 64.

¶ 48    We first note that Charles's assertion that there are no aggravating factors in this case flies in the face of R.G.'s victim impact statement, in which she detailed the lasting effects the attack has had on her life. Further, although Charles elected to testify at trial, he said nothing in

allocution. Because he waived his right to remain silent, the trial court could properly consider Charles's failure to express remorse at sentencing in deciding to impose a sentence greater than the minimum. See *People v. Ward*, 113 Ill. 2d 516, 528 (1986) (trial court can properly consider a defendant's lack of remorse as it affects his prospects for rehabilitation); *People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011). Finally, the court expressly stated that it had read the PSI and considered the parties' arguments, including defense counsel's argument that Charles was 23 years old with no significant criminal history, and we will not assume that the court failed to take those factors into consideration. On this record, there is no basis to conclude that Charles's sentence for each offense—only one year over the minimum for each—was excessive.

¶ 50    The judgment of the circuit court of Cook County is affirmed.

¶ 51    Affirmed.