2022 IL App (1st) 190492-U

No. 1-19-0492

Order filed November 10, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 21890 |
| | ) | |
| EUGENE BOOKER, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm defendant's conviction of first degree murder where the trial court did not err by admitting evidence of his two prior sexual assaults to show the victim did not consent during the rape that preceded the instant offense. The prosecutor's comments during closing arguments did not constitute reversible error.

¶ 2     Following a jury trial, defendant Eugene Booker was convicted of first degree murder (Ill. Rev. Stat., ch. 38, § 9-1(a)(1)) and sentenced to 40 years' imprisonment. On appeal, defendant contends that (1) the trial court improperly allowed other-crimes evidence showing he sexually

assaulted two women in unrelated cases, and (2) the prosecutor repeatedly argued facts not in evidence during closing arguments. For the following reasons, we affirm.

¶ 3    On December 15, 2014, defendant was charged with three counts of first degree murder for the 1981 stabbing death of Carol Novak. The State alleged that defendant killed Novak intentionally or knowingly (count I), knowing he created a strong probability of death or great bodily harm (count II), and while committing rape (count III).

¶ 4    On June 9, 2015, the State filed a pretrial motion to admit evidence of seven crimes defendant committed between March and November 1986. The State argued the evidence was admissible to show defendant's propensity to commit sex offenses pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2014)). Additionally, the State maintained the evidence was admissible to show intent, identity, *modus operandi*, motive, and lack of consent. Six offenses involved defendant's convictions for aggravated criminal sexual assault. Each of those victims, women between ages 21 and 42, were attacked in their homes on the north side of Chicago in the evening. In each instance, defendant gained entry by catching an open door or concocting a ruse. Defendant strangled several victims, and in five of the incidents, he held a knife or sharp instrument to the victim's neck. The seventh conviction was for aggravated battery, where the female victim managed to escape from defendant. While in the military, defendant was also convicted of rape and assault and imprisoned from February 1982 to December 1985, a time period between this offense and the occurrence of the other crimes.

¶ 5    At the hearing on the motion, the State withdrew its request to allow the other-crimes evidence to show propensity but maintained that the evidence was admissible to show defendant's intent, identity, motive, *modus operandi*, and lack of consent. The court allowed the motion as to

three aggravated criminal sexual assault offenses, noting that the trial transcripts from those cases would aid defense counsel in cross-examining the victims. The trial court denied the motion as to defendant's four other convictions because he had pled guilty in those cases and the files had since "been destroyed."

¶ 6 Defendant's trial began on October 22, 2018. In opening statements, the State informed the jury that Novak was murdered on October 2, 1981, in her home on the 5800 block of North Paulina Street in Chicago. She was discovered wearing only a bra and jeans, and had been sexually assaulted and stabbed. "[T]he case went cold" until 2013, when new forensic testing of the evidence revealed a match with defendant's DNA profile.

¶ 7 In his opening statement, defense counsel acknowledged that defendant had convictions for rape and had served a prison sentence. Defendant, however, "did not murder Carol Novak," and the evidence would not "even prove that he forcibly raped her." Counsel told the jury that no witness would testify as to when or where the sexual encounter between defendant and Novak occurred. Furthermore, the State would not produce "a single eyewitness as to whether or not the sexual encounter was by force or was consensual."

¶ 8 Thomas Loftus testified that Novak was his girlfriend in October 1981. He drove Novak to work most mornings but when he did not drive, Novak took the CTA Red Line. On October 1, 1981, Loftus spoke with Novak on the phone at 3:30 p.m. while she was at work. Later, he met a friend for dinner and drinks. After returning home, Loftus called Novak around 8:30 p.m. but she did not answer.

¶ 9 When Loftus arrived at Novak's residence around 6 a.m. the next morning, her back door was unlocked and the lights were on. He opened the door and saw blood on the floor and broken

blinds on the window. Loftus found Novak's dog in the pantry with blood on the side of its head and saw Novak on her living room floor covered in blood. After touching her, he knew "she had been dead for some time." Loftus called the police, who took his fingerprints, fingernail scrapings, and a blood sample.

¶ 10    Retired Chicago police detective James Gildea testified that on October 2, 1981, he entered Novak's home and observed her body face down on the floor just inside the living room. A trail of blood led from her body to a bedroom, through the kitchen, and to the enclosed back porch. There was a large blood stain on the back porch and the blinds from the porch window were on the floor. In the bedroom, Gildea saw bloodstains "in the shape of hands" on the bedsheets. A blue blouse was on the bed, and four buttons from the blouse were on the floor. A pair of panties were also on the floor, "three or four feet from the bed." When Gildea spoke with Loftus at Novak's house, he observed no marks, scratches, or cuts that would indicate Loftus had been in a fight.

¶ 11    Retired Chicago police detectives John Quattrocki and Tom Ginnelly testified that they photographed the crime scene, lifted fingerprints, and took vials of blood "everywhere [they] found it." The detectives recovered a bloody bedsheet from the bedroom, as well as an "oxford-style" blue shirt "that appeared to have been either torn apart or torn off" so that the buttons "had come off." Ginnelly went to the morgue to collect Novak's blood vial, hair samples, and her oral, vaginal, and rectal swabs. Retired Chicago police detective J.J. Bittenbinder testified that he recovered a bloodstained woman's jacket from Novak's home and transported it to the crime lab.

¶ 12    Cook County assistant medical examiner Dr. Kirstin Howell testified that she reviewed Novak's autopsy report dated October 3, 1981. Novak wore a white bra and blue jeans, but not underwear. Her body had 105 "sharp force injuries" to the face, neck, right shoulder, and trunk.

Injuries to the right upper and lower lobes of the lungs caused the lungs to collapse. On cross-examination, Dr. Howell stated that the vaginal and cervical exam proved "unremarkable" with no notation of injury or trauma. Such injuries, however, are not always associated with sexual assault. Howell opined that the cause of death was "multiple stab wounds" and the manner of death was homicide.

¶ 13    Christine Kokoconski Sahs, a microanalyst for the Chicago police department crime lab, testified that in October 1981 she conducted chemical tests on the bloodstains found on the bedsheets and jacket. She also examined Novak's oral, rectal, and vaginal swabs for the presence of semen. The vaginal swab tested positive for semen, but the oral and rectal swabs did not. She did not perform DNA testing on the samples because such testing did not exist in 1981. Sahs retained the bedsheet and six cuttings from the jacket for future testing.

¶ 14    Retired Chicago police detective Denise Troche testified that in 2013, she reviewed Novak's case for the cold case investigations team. She located evidence including Novak's vaginal swab and blood vial, Loftus's fingernail scrapings, a box of blood extracts from a bedsheet, and six cuttings from a woman's jacket.

¶ 15    Chicago police detective Rolando Rodriguez testified that he obtained a warrant to collect DNA samples from defendant at Hill Correctional Center in February 2014. Rodriguez showed defendant photographs of Novak, but defendant said he had never seen her. After obtaining a buccal swab and thumb prints from defendant, Rodriguez sent the material to the crime lab.

¶ 16    Kelli Byrd, a senior forensics DNA analyst at Bode Cellmark, testified that she conducted DNA analysis in Novak's case. She tested some "threads" with Novak's blood, which she used as

the standard for Novak's DNA profile. She also received Loftus's fingernail clippings containing his DNA profile.

¶ 17    Byrd then analyzed the sperm found on Novak's vaginal swab and identified a partial male DNA profile that did not match Loftus's profile. She analyzed two cuttings containing blood from a woman's jacket and found an unknown partial male DNA profile that appeared to be the same as the partial profile on the vaginal swab. Another bloodstain from the jacket revealed a mixed DNA profile, with the major profile originating from a male with the same DNA profile as the unknown male from the sperm sample. She tested a bloodstain on the bedsheet, which also contained a mixture of DNA. The major DNA profile was consistent with Novak's profile and the minor DNA profile originated from a male with the same DNA profile as the sperm on Novak's vaginal swab.

¶ 18    Byrd sent the unknown male DNA profile to the Illinois State Police crime lab. After the information was run through the FBI's national database, defendant was linked to the male DNA profile in Novak's case.

¶ 19    Byrd received defendant's DNA standard from the Illinois State Police in 2014. She concluded that defendant's DNA profile was consistent with the partial male DNA profile from the sperm on Novak's vaginal swab. The chance of a random person matching the DNA profile found on the swab was 1 in 51.03 trillion black, 1 in 93.67 trillion southwestern Hispanic, 1 in 2.49 trillion southeastern Hispanic, 1 in 1.43 trillion Asian, and 1 in 286.6 trillion white individuals. Defendant's DNA profile was also consistent with the partial male DNA profile found in the three bloodstains from the woman's jacket and defendant could not be excluded as a contributor to the mixed profile found on the bedsheet.

¶ 20 Greg Didomenic, a biology DNA supervisor at the Illinois State Police, testified that he used the standard received from defendant and identified a DNA profile suitable for comparison. Didomenic confirmed that defendant could not be excluded from the partial male DNA profile obtained from Novak's vaginal swab.

¶ 21 Before the State called the next two witnesses, the trial court gave the following instruction to the jury:

"Evidence will be received that defendant was involved in offenses other than charged in the indictment. This evidence will be received on the issues of defendant's identification, intent, *** motive, modis [*sic*] operandi, common design, and lack of consent and may be considered by you only for those limited purposes."

¶ 22 P.M. testified that around 8:30 p.m. on November 6, 1986, she was dropped off near her building on the 800 block of West Brompton Avenue in Chicago. She entered the vestibule carrying her briefcase and groceries. P.M. saw a hand catch the entrance door. A black man with a long beard entered the vestibule. She identified defendant in court as that man.

¶ 23 Defendant told P.M. that he wanted to surprise his friend "Johnny" who lived on the second floor, and asked P.M. to let him into the building. P.M. told defendant he would need to "buzz" his friend. Defendant said Johnny was not his friend and would not answer if defendant buzzed his apartment. P.M. felt "something was wrong" and tried to slip through the locked interior door. However, defendant stepped inside before P.M. could close the door.

¶ 24 P.M. ran up the stairs, but defendant grabbed her, pulled her close to him, and put a knife or box cutter to her cheek. Defendant ordered P.M. to unlock the door to her apartment and threatened to "slash" her face if she disobeyed. Inside the apartment, defendant pushed P.M. into

the bedroom, blindfolded and gagged her, and tied her with her pantyhose. When P.M.'s telephone rang, defendant disconnected her answering machine. He continued to hold the knife to her face.

¶ 25    Defendant told P.M. to remove her clothes. As she fumbled with a pin on her collar, defendant "reached up and ripped it off" of her blouse. Defendant bent P.M. over her bed and penetrated her vagina with his penis. He penetrated her again as she lay on her back. After the assault, defendant took P.M. to the bathroom and turned on the water in the bathtub. He said he would check on her and if she moved, he would kill her. He checked four or five times. After a long time without defendant returning, P.M. fled and screamed for help. She later discovered that defendant stole money, liquor, a clock radio, and jewelry. On January 7, 1987, P.M. identified defendant in a line-up as the man who attacked her.

¶ 26    S.L. testified that on April 10, 1986, she left work around 8:30 p.m. and took the bus to her building on the 1200 block of West Loyola Avenue in Chicago. While at her mailbox in the lobby, she heard a tap on the locked glass front door. A man, whom S.L. identified in court as defendant, told S.L. that he forgot his keys and asked her to let him in. S.L. opened the door. As she walked up the stairs to her apartment, defendant closely followed her. He asked if "Debbie Truman" lived in the building and S.L. became concerned. When defendant asked to use S.L.'s phone, she told him to use the phone at the nearby CTA Red Line station.

¶ 27    S.L. tried to run but defendant grabbed her and put his hand over her mouth. With his other hand, he held a knife to her neck and told her not to scream. Defendant ordered S.L. to open the door to her apartment and pushed her into her bedroom, where he instructed S.L. to remove her clothing down to her camisole and slip. After she complied, defendant tied and gagged her with her pantyhose, and blindfolded her with a shirt. He asked where she kept her money, liquor, and

jewelry. Defendant ordered S.L. to lie flat on the bed and he penetrated her vagina with his penis. After the assault, S.L. heard defendant turn on the water in the bathroom. She remained still for "an eternity" until she realized there was "nothing left for him to do" but kill her. S.L. dressed and ran to the CTA station to call the police. She later discovered that she was missing money and jewelry. On January 8, 1987, she identified defendant in a line-up as the person who assaulted her.

¶ 28    The State rested after presenting a total of 15 witnesses. Defendant moved for a directed verdict, which the trial court denied.

¶ 29    The defense called Fran Langner who testified that she worked with Novak. On October 1, 1981, Novak told Langner that she was taking a personal day on October 2, 1981, to prepare for company coming to visit her for the weekend.

¶ 30    Pam Mueller testified that shortly after Novak's murder, Mueller's friend Rita Burke asked her to help clean Novak's home. Burke was also a friend of Novak. While cleaning the home, Mueller noticed two wine glasses on the coffee table.

¶ 31    Rosa Silva, an investigator, testified that she worked with defendant's trial attorney to investigate Novak's murder. She went to Loftus's home in March 2017 to interview him, but he declined.

¶ 32    Prior to closing arguments, the court instructed the jury regarding the elements of the charged offenses and also defined the term "rape." In relevant part, the court stated that "when I use the words force or against her will, I mean that under the circumstances, the female did not voluntarily consent to sexual intercourse." The trial court also instructed jurors that "the evidence you should consider consists only of the testimony of witnesses, the exhibits and the stipulations which the Court has received." Further,

"Closing arguments *** should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorney which is not based on the evidence should be disregarded."

¶ 33    The State's closing argument, comprising approximately 12 pages of the report of proceedings, primarily focused on evidence showing that defendant's DNA profile was consistent with the DNA evidence found at the crime scene. The State urged the jury to consider the DNA evidence from the semen and blood, which was the "ultimate circumstantial evidence." Given the probabilities of a match like defendant's, "[t]here is no doubt this defendant's DNA was in Carol Novak's vagina." Her body was discovered face down, with bare feet, wearing only a bra and jeans with no underwear. The State further argued,

"What happened is that the defendant raped Carol Novak, and then when he was going through her house or whatever he was doing, she thought she could make a break for it and she pulled on her jeans and she tried to run out of there. *** There is nothing about this picture that tells you anything was consensual about what happened in her apartment in October of 1981.

You also heard about how there was blood throughout the house. There was a struggle. Carol probably went to this door and tried to get out, and the blinds were knocked down. *** That evidence tells you this was not consensual.

* * *

And this, again, is another big problem with the interpretation that the defense offered you in opening statement, because the person who killed and raped Carol Novak, stabbed her

- 10 -

over a hundred times, you better believe that that knife slipped and that person who did that stabbing cut their hand and left their blood behind, which explains the blood DNA, and tells you and gives you one reasonable conclusion about what happened in this case.

\* \* \*

When you put all this evidence together, the DNA, the defendant's common design and modus operandi and his motive in these attacks, there is \*\*\* only one reasonable conclusion as to all of this evidence, this defendant came upon [Novak] as she was coming home that night. He had a knife. He gained access to her house because he approached her with that knife and he took her to the bedroom, where you saw the panties on the floor, where you saw the blood streaked on that bed \*\*\* and he raped [Novak], and then maybe he learned his lesson and subsequently tied up the other women.

He went through the house. [Novak] made a break for it, but he was still there and he attacked. He stabbed [Novak] repeatedly and he cut himself."

¶ 34    In closing argument, defense counsel argued that Loftus killed Novak after discovering she had sex with defendant. Stabbing a person over 100 times was an act of passion or jealousy, not the act of an unknown intruder. Counsel also argued that Novak's case was different from the attacks on P.M. and S.L. in that defendant's method of entering apartment buildings would not work for a single-family home. Also, P.M. and S.L. were blindfolded, gagged, and tied with pantyhose, and defendant stole valuables. In the other cases, defendant turned on the water before leaving the apartment and cut the phone cord. Novak's case had none of these details.

¶ 35    In rebuttal, the State argued that the other offenses were similar to Novak's case because "[s]omehow he got into the house. \*\*\* He either struck up a conversation with her. Can I use your

phone, my car broke down, or he laid in wait outside of her porch, waited for her to start to open the door and put a knife to her, just like the other two, modus operandi." Also, "[o]nce he got into the house he raped her with the knife. And they're saying, well, its [*sic*] not a violent rape. *** He went as he usually does foraging through the house looking for things to steal." Defense counsel objected, arguing that the State's remark misstated the evidence. The trial court overruled the objection.

¶ 36    As the jury deliberated, the defense moved for a mistrial based on the prosecutor's misstatements and also renewed its motion for a directed verdict. The trial court denied both motions.

¶ 37    The jury found defendant guilty of first degree murder.

¶ 38    Defendant filed a motion for a new trial, arguing that the admission of other-crimes evidence and the prosecutor's comments during closing argument denied him a fair trial. The trial court denied the motion.

¶ 39    Following a hearing, the trial court sentenced defendant to 40 years' imprisonment. Defendant filed a motion to reconsider sentence, which the trial court denied.

¶ 40    On appeal, defendant first contends that the admission of P.M.'s and S.L.'s testimony was error where (1) the evidence was admitted for no permissible purpose, (2) defendant's attacks on P.M. and S.L. were not similar to the attack on Novak, and (3) the trial court's overbroad instruction to the jury regarding the other-crimes evidence prejudiced him.

¶ 41    Evidence is admissible if it is relevant. *People v. Pikes*, 2013 IL 115171, ¶ 21 (citing Ill. R. Evid. 402 (eff. Jan. 1, 2011)). Relevant evidence tends to make the existence of any fact consequential to the case's determination more or less probable than it would be without the

evidence. *Id.* (citing Ill. R. Evid. 401 (eff. Jan. 1, 2011)). Other-crimes evidence, however, is generally inadmissible not because it is irrelevant, but because it has "too much" probative value. *People v. Manning*, 182 Ill. 2d 193, 213 (1998). Such evidence may cause the jury to convict a defendant for being "a bad person deserving punishment." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Other-crimes evidence is admissible, however, "to prove intent, *modus operandi*, identity, motive, absence of mistake, and any material fact other than propensity that is relevant to the case." *Id.*; see also Ill. R. 404(b) (eff. Jan. 1, 2011)). We review the trial court's ruling on the admissibility of other-crimes evidence for abuse of discretion, which occurs when the ruling is arbitrary or fanciful, or where no reasonable person would take the trial court's view. *Id.* at 182.

¶ 42    Prior to trial, the trial court allowed the State's motion to introduce the other-crimes testimony of P.M. and S.L. in order to show defendant's intent, identity, motive, *modus operandi*, and lack of consent. Before P.M. and S.L. testified, the court admonished the jury that their testimony could be considered "only for the those limited purposes."

¶ 43    The State's theory of the case was that on October 1, 1981, defendant encountered Novak as she returned home and gained access to her house. Wielding his knife, defendant took Novak to the bedroom where he raped her. Afterwards, as defendant went through her house, Novak pulled on her jeans without her underwear and tried to escape. She struggled with defendant, as shown by the blinds on the floor and blood throughout the house. According to the State, nothing "was consensual about what happened in her apartment in October of 1981." Instead, the evidence showed that "the person who killed and raped Carol Novak stabbed her over a hundred times *** and left their blood behind." Defense counsel, however, argued that defendant had consensual sex

with Novak prior to her murder. Counsel claimed that Loftus, Novak's boyfriend, discovered her infidelity and stabbed Novak in a fit of rage.

¶ 44   Whether Novak consented to sex with defendant was clearly a material issue in the case. Defendant, however, argues that other-crimes evidence is not relevant for establishing lack of consent in sexual assault cases under *People v. Barbour*, 106 Ill. App. 3d 993 (1982).

¶ 45   In *Barbour*, the complainant testified that the defendant forcibly raped her, while the defendant testified that the complainant voluntarily consented to sexual intercourse. *Id.* at 996-97. On appeal, the defendant argued that the trial court erroneously admitted evidence of two prior alleged sexual assaults. *Id.* at 999. The State contended that the evidence was admissible to show defendant's *modus operandi* of acting without consent. *Id.* at 1000. The appellate court found the State's argument "illogical," reasoning that the lack of consent of former victims was "wholly irrelevant to this issue of this complainant's consent." *Id.* The *Barbour* court did recognize that other crimes evidence that shows intent may be admissible. *People v. Johnson*, 239 Ill. App. 3d 1064, 1076 (1992) (citing *Barbour*, 106 Ill. App. 3d at 1001).

¶ 46   Appellate courts after *Barbour* have distinguished or disagreed with its holding. In *Johnson*, 239 Ill. App. 3d at 1076, the defendant was convicted of aggravated criminal sexual assault after presenting a defense that the victim had consented. During trial, the trial court admitted other-crimes evidence as it was relevant to whether the defendant had "acted with an innocent frame of mind." *Id.* at 1075. This court noted that the State in *Barbour* offered the other-crimes evidence to demonstrate *modus operandi*. Because the State in *Johnson* offered the evidence to show absence of an innocent frame of mind, *Barbour* was inapplicable. *Id.* Other courts, citing *Johnson*, have found that trial courts did not err in admitting evidence of prior

assaults where the evidence was relevant to prove the defendants' intent or lack of an innocent frame of mind when consent was an issue. *People v. Boyd*, 366 Ill. App. 3d 84, 91-92 (2006); see also *People v. Luczak*, 306 Ill. App. 3d 319, 325 (1999) (evidence of defendant's prior crime was relevant to show that he intended to sexually assault the victim); *People v. Harris*, 297 Ill. App. 3d 1073, 1086 (1998) (other-crimes evidence "tends to show that defendant did not act with an innocent intent"); *People v. Brown*, 214 Ill. App. 3d 836, 845 (1991) (questioning the persuasiveness of *Barbour* because *modus operandi* evidence is "relevant and admissible on the distinct issue of whether a crime was committed at all").

¶ 47   Following *Johnson*, *Boyd*, *Luczak*, and *Harris*, we find that defendant's intent when he encountered P.M. and S.L. was relevant to establish Novak's lack of consent, a material issue in this case.

¶ 48   Next, we consider whether general similarities existed between the cases of P.M., S.L., and Novak to justify the admission of the other-crimes evidence. *Johnson*, 239 Ill. App. 3d at 1074.

¶ 49   The required extent of similarity depends on the purpose for which the other-crimes evidence is offered. *Johnson*, 239 Ill. App. 3d at 1074. If the evidence is used to show *modus operandi* or common design, "there must be a high degree of identity between the facts of the crime charged and the other offense." *People v. Illgen*, 145 Ill. 2d 353, 372-73 (1991). In contrast, "when the evidence is offered to prove criminal intent or the lack of an innocent frame of mind, general similarities will suffice to justify admission." *Johnson*, 239 Ill. App. 3d at 1074. Where the defendant claims that the complainant consented to sexual activity, prior crimes evidence is admissible to "allow the jury to determine if he acted with an innocent frame of mind." *Id.* at 1075. Therefore, the less stringent test applies. *Id.*

¶ 50    Here, details of events preceding and during all three assaults are similar. Like Novak, P.M. and S.L. lived on the north side of Chicago when defendant assaulted them in their residences. The three attacks occurred in the evening and defendant did not break into the residences. S.L. and Novak lived near the Red Line. Defendant wielded a knife or sharp instrument and forced the women into their bedrooms. P.M. testified that defendant ripped the pin off her blouse when she took too long to unfasten it; in Novak's bedroom, police found a blouse "that appeared to have been either torn apart or torn off." Defendant penetrated the three women vaginally with his penis.

¶ 51    Defendant argues that "certain distinctive features" of the other-crimes evidence were not present in Novak's case. Specifically, defendant tied P.M. and S.L. with pantyhose, cut their phone cords, turned on the water in the bathroom before leaving, and stole jewelry, money, and liquor from them. No such evidence was found in Novak's case. As support, defendant cites *People v. Smith*, 406 Ill. App. 3d 747 (2010), and *People v. Johnson*, 406 Ill. App. 3d 805 (2010). These cases are distinguishable. In *Smith*, the prior alleged crimes occurred approximately 30 to 40 years before the charged offense and involved different sexual acts. *Smith*, 406 Ill. App. 3d at 754. In *Johnson*, the prior uncharged offense differed in the number of attackers, whether drugs and alcohol were involved, and in how the offender penetrated the victim. *Johnson*, 406 Ill. App. 3d at 811.

¶ 52    Novak's case did not have a 40-year time gap between the offenses and her attack, and the method of assault was the same: vaginal penetration. All three cases also had similar details in how defendant committed the assaults. The existence of some differences does not necessarily defeat the admissibility of the other-crimes evidence "because no two independent crimes are identical." *Donoho*, 204 Ill. 2d at 185.

¶ 53    Moreover, we disagree that the admission of the other-crimes evidence unduly prejudiced defendant. Other-crimes evidence that is relevant "must not become a focal point of the trial." *Boyd*, 366 Ill. App. 3d at 94. Where the bulk of the State's case did not consist of other-crimes testimony, and the trial court admonished the jury to consider the evidence for limited purposes, "any prejudice from it would not outweigh its probative value." *People v. Novak*, 242 Ill. App. 3d 836, 860 (1993).

¶ 54    The trial court in this case carefully considered the evidence of other crimes and its potential prejudicial effect. The State sought to admit seven prior offenses, but the court allowed only three because defendant had pled guilty in the other four cases and those files were "destroyed." Of the State's 15 witnesses, only P.M. and S.L. testified about prior offenses. The State's closing argument comprised 12 pages of the report of proceedings, but specific references to the attacks on P.M. and S.L. consisted of only half a page. The State's theory of the attack on Novak, based on the other-crimes testimony, comprised approximately one page of the record.

¶ 55    The court also instructed the jury to consider the other-crimes evidence only for identification, intent, motive, *modus operandi*, common design, and lack of consent. Although defendant complains that the instructions were overly broad where the trial court did not limit the jury's consideration of the evidence to lack of consent, defendant was not prejudiced by the instructions. The other-crimes evidence was properly admitted to show lack of consent, and the trial court's instruction was not so "confusing that the jury could not properly use the evidence for that purpose." *People v. Bartall*, 98 Ill. 2d 294, 316 (1983). Thus, even if the evidence was inadmissible to show identity, motive, *modus operandi*, or common design, as defendant suggests,

its admissibility to show lack of consent would remain unaffected. *People v. Arze*, 2016 IL App (1st) 131959, ¶ 102.

¶ 56 Furthermore, any error in admitting the other-crimes evidence was harmless if "defendant would have been convicted regardless of the error." *People v. Dean*, 175 Ill. 2d 244, 259 (1997). Defendant's DNA profile was consistent with the partial male DNA profile from the sperm on Novak's vaginal swab, and consistent with the partial male DNA profile found in the three bloodstains from the jacket. Defendant also could not be excluded as a contributor to the mixed DNA profile found in the blood on the bedsheet. A trail of blood throughout Novak's house led to her partially clothed body in the living room. The blinds on the back porch window were knocked down and a large pool of blood was found on the porch floor, indicating a struggle occurred there.

¶ 57 A jury need not disregard inferences that flow normally from the evidence or be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. *People v. Charles*, 2018 IL App (1st) 153625, ¶ 25. It is "sufficient if the evidence as a whole satisfies the trier of fact beyond a reasonable doubt" that defendant committed the offense. *Id.* The circumstantial evidence strongly indicated that Novak was sexually assaulted and then killed by defendant. Given the strength of the State's evidence against defendant, the outcome of his trial would not have been different had the trial court excluded the other-crimes evidence.

¶ 58 Defendant next contends that the prosecutor improperly argued facts not in evidence during closing and rebuttal arguments. Defendant concedes that he did not object to every comment he now challenges on appeal, but requests that we consider his claim as plain error. Alternatively, defendant argues that defense counsel was ineffective for not preserving the State's misstatements for review.

¶ 59 To preserve this issue for review, defendant must have objected to the comments at trial and raised the issue in a written posttrial motion. *People v. Jackson*, 391 Ill. App. 3d 11, 37 (2009). A reviewing court, however, may consider unpreserved claims of error as plain error when a clear or obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). First, we must determine whether any error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 60 Prosecutors have wide latitude during closing arguments and may comment on the evidence and on any fair and reasonable inferences therefrom. *People v. Jackson*, 2020 IL 124112, ¶ 82. A prosecutor may "comment upon the evidence presented and upon reasonable inferences arising therefrom, even if such inferences are unfavorable to the defendant." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). "A reviewing court will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Id.* In making this determination, a reviewing court considers the closing argument as a whole. *People v. Perry*, 224 Ill. 2d 312, 347 (2007).

¶ 61 Defendant's opening brief challenges the State's "*entire* narrative theme about how [defendant] committed this offense," as expressed in its closing arguments. (Emphasis in the original.) He contends that these comments were improper where the only evidence presented was the discovery of Novak's body and the fact that defendant's DNA was found at the scene. No one testified about how defendant entered Novak's residence or whether he searched her house for

valuables, or when the "sex act" occurred or whether it was consensual. Defendant argues that the prosecutor's comments therefore amounted to speculation "without any evidentiary basis."

¶ 62    We disagree that the State's "entire narrative" was improper. The evidence showed that Novak's partially clothed body was found in the living room and a trail of blood led from her body to the bedroom, through the kitchen and the back porch. The blinds on the porch had been ripped down. Her damaged blouse and underwear were found in the bedroom. DNA evidence from semen and blood placed defendant at the scene. It can be reasonably deduced from the evidence that Novak did not consent to the "sex act," was raped in her bedroom, and tried to escape from her assailant.

¶ 63    The State also presented testimony from P.M. and S.L. to show defendant's intent regarding Novak. Their testimony revealed that defendant had concocted stories to persuade P.M. and S.L. to let him into their buildings before he sexually assaulted them. In this case, the back door of Novak's house was unlocked when her body was discovered. The prosecutor reasonably argued from this evidence that defendant either "struck up a conversation" with Novak to enter her house or forced his way into the house after she opened the door.

¶ 64    We do find some merit to defendant's contentions that certain comments by the State could not be reasonably inferred from the evidence. The State argued that defendant went through Novak's house looking for items to steal. Although defendant did steal belongings from P.M. and S.L., there was no evidence that defendant stole or attempted to steal from Novak. Additionally, the prosecutor maintained that since the assaults on P.M. and S.L. occurred after Novak's murder, defendant had "learned his lesson" and he gagged and tied P.M. and S.L. during their assaults. There was no direct evidence as to why defendant restrained and gagged his later victims.

¶ 65    Even if these remarks were improper, when viewed in the context of the closing argument as a whole, they did not impact the verdict. Further, the trial court instructed the jury that "[n]either opening statements nor closing arguments are evidence, and any statement or argument made by the attorney which is not based on the evidence should be disregarded." Such an instruction cured any error that may have occurred regarding the prosecutor's comments. *People v. Simms*, 192 Ill. 2d 348, 396 (2000). We find that the State committed no reversible error and that defendant was not deprived of a fair trial. *People v. Johnson*, 218 Ill. 2d 125, 141-43 (2005).

¶ 66    Since there was no reversible error in the State's closing arguments, we need not address defendant's alternative argument that defense counsel was ineffective for failing to preserve the issue for review. *People v. Jaimes*, 2019 IL App (1st) 142736, ¶ 58.

¶ 67    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 68    Affirmed.